GEORGE W. CUYLER, Assignee of WILLIAM T. CUYLER, Appellant, v. HUGH McCARTNEY, ALLEN AYRAULT, ANSON D. SMITH, Administrator, &c., JOHN VERNAM, RICHARD P. FITZHUGH, HENRY SWAN and DANIEL H. FITZHUGH, Respondents.

After the execution and delivery of an assignment in trust for the benefit of creditors, and the entry of the trustees upon the performance of the trust, by taking possession of the assigned property, the assignor cannot, by his declarations or admissions, made out of court, invalidate the assignment or furnish evidence of his own or the trustees' fraudulent intent in making or receiving it, to defeat the title of the latter.

40   221
110   211

40   221
111   282

40   221
127   634

40   221
131   312

40   221
160   470

Even if the assignor's fraudulent intent be alone sufficient to invalidate the assignment, or defeat the title of the assignees, such intent cannot, *as against them*, be proved by evidence of such declarations or admissions of the assignor.

Where the fact stands proved in the case, that the assignor and assignee had joined together in a conspiracy to hinder, delay or defraud the creditors of the former, then the acts or declarations of either, made in execution of the common purpose and in aid of its fulfillment, are competent evidence against any of the parties.

But the existence of such conspiracy must be established, as against the assignee, by evidence independent of such subsequent declarations and acts of the assignor; and the latter cannot properly be used in addition to the other evidence, when not sufficiently clear without it, to establish that fact. .

In cases of conspiracy, when the combination is proved, the subsequent acts and declarations of the conspirators are not received as evidence of that fact, but to show what was done and the means employed in furtherance of it, and, generally, those details which unfold its extent, scope and influence upon the public or the individuals who suffer from the wrong.

Where W. and C. were named as assignees in an assignment in trust for creditors, and both accepted the trust, entered upon its execution, and subsequently brought an action against the sheriff and certain judgment creditors of the assignor for the seizure of some of the assigned property under executions issued upon the judgments of the latter, which action was defended on the ground that the assignment was fraudulent and void as against creditors; and before the trial of the action W. was removed from the trust, and C. remained sole assignee and plaintiff—*Held* (DANIELS and LOTT, JJ., *dissenting*), that it was error to admit upon the trial, the declarations of the assignor to and his conversation with W. (subsequent to the assignment, but prior to the removal of the latter as assignee), tending to show that the assignor retained control and possession of the assigned property, was concealing some of it and committing other fraudulent acts.

Such declarations and conversations are not admissible as involving an express or implied admission of their truth by a party to the action.

Nor, as implied admissions of W., while in possession of the property, are they evidence against his co-assignee, the latter not holding under or from W., but under the assignment.

An assignment honestly made, for a lawful purpose, cannot be defeated by proof that the assignees abused their trust, misappropriated the property, or took dishonest means to preserve it from seizure by the sheriff; but, upon the trial of an issue, as to the object and purpose of the assignment, whether lawful or fraudulent, the immediate conduct of the assignees on taking possession, their acts in the anticipation of the good faith and validity of the assignment being questioned by creditors, and all like circumstances, are competent evidence for the jury.

. (This cause was argued on the 16th January, 1869, and decided on the 22d of March, 1869.)

. THIS was an appeal from the judgment of the General Term of the Supreme Court, in the seventh judicial district, affirming the judgment for defendants, entered upon the verdict of a jury in their favor. The action was brought by the plaintiff, as assignee of William T. Cuyler, to recover for the alleged conversion of certain personal property, included in the assignment, but seized by the defendant, McCartney, sheriff of the county of Livingston, under executions in his hands, issued upon certain judgments recovered by the other defendants against the assignor.

The suit was commenced in the name of George M. Cuyler and William B. Wooster, the latter being one of the original assignees; but subsequently, and before the trial, Wooster was removed as assignee, and the appellant remained sole plaintiff and assignee.

William T. Cuyler, about the 31st of August, 1857, conveyed to said George W. Cuyler and William B. Wooster, the original plaintiffs, all his real and personal property, in trust for his creditors, giving certain preferences. The assignees took, or claimed to have taken, possession of the assigned property on the same day. In October following, the defendant, McCartney, then sheriff of Livingston county, levied on about $45,000 worth of the assigned property, to satisfy certain executions then in his hands. This levy the plaintiff insists was a wrongful taking; and the defendants justify, alleging that the assignment was fraudulent and void, as made with intent to hinder, delay, and defraud the creditors of William T. Cuyler, the assignor. They allege that the plaintiff, George M. Cuyler, the son of the assignor, accepted the assignment with the knowledge of the fraudulent intent of his father, and with the purpose of aiding and assisting him to carry out that intent.

It appeared from the assignment, that the assignees were directed to pay the plaintiff $8,000, as a debt due him from the assignor, and to pay to laborers in the employment of the

assignor, in the aggregate, the sum of $15,000; and the defendants alleged that these debts were fictitious and fraudulent. They also alleged that the assignor, since the assignment, retained control and possession of the property, and that he and the assignees misappropriated, concealed, and were fraudulently disposing of the assigned property.

Upon the trial numerous exceptions were taken by the plaintiff to the admission of evidence offered by the defendants, especially of declarations and acts of the assignor, subsequent to the assignment. Exceptions were also taken to the directions of the judge, as to the effect of the acquiescence by the assignee in misappropriations of the property since the assignment. The evidence objected to will be found stated with sufficient particularity in the following opinions, both prevailing and dissenting.

The judgment of the Supreme Court in the case is reported in 33 Barbour, 165.

*George F. Danforth*, for the appellant, upon the point, that the declarations of the assignor, made subsequent to the assignment, were not admissible against the assignee, cited, *Jacobs* v. *Remsen* (36 N. Y., 670); *Taylor* v. *Marshall* (14 John., 204; *Beach* v. *Wise* (1 Hill, 612); *Sprague* v. *Kneeland* (12 Wend., 161); *Paige* v. *Cagwin* (7 Hill, 361); *Booth* v. *Sweezey* (4 Seld., 279); *Hanna* v. *Curtis* (1 Barb. Ch., 263); *Ogden* v. *Peters* (15 Barb., 560); *Lewis* v. *Long* (3 Mumford, 14); *Ford* v. *Williams* (3 Kern., 577). Upon the point, that the evidence to show a conspiracy (independent of the assignor's declarations), in order to render those declarations admissible, must be so strong, that the court would set aside a verdict against it, he cited *Jones* v. *Hurlburt* (39 Barb., 403, *et seq*). And that, even then, these declarations only were admissible, which were made during the pendency of the common design, and in furtherance of its objects, constituting a part of the *res gestæ*, he cited *Althorp* v. *Comstock* (2 Paige, 482); COWEN, J., in *Waterbury* v. *Sturtevant* (18 Wend., 354); 1 Rawle, 360, 458; 1 Hawks, 442; *Fogg* v.

*Child* (13 Barb., 246). Upon the point that evidence of the removal or concealment of the property, subsequent to the assignment, and at the commencement of the levy, was not competent upon the question of the character of the assign ment, he cited *Browning* v. *Hart* (6 Barb., 91).

*Scott Lord*, for the respondents, upon the point, that the declarations of the assignor as to his object in making the assignment, uttered while he was in possession of the property, are admissible against his assignee, cited *Adams* v. *Davidson* (10 N. Y., 309, 313); *Willies* v. *Farley* (3 Carr & Payne, 395); *Hansell* v. *Bryan* (19 Georg. R., 167); *Babb* v. *Clemson* (10 Serg. & Rawle, 419, 426, 427); *Wilbur* v. *Strickland* (1 Rawle, 458); Cowen & Hill's notes, 1 vol., 602; *Guidry* v. *Grivot* (2 Martin's Lou. R. N. S., 13); *Martin* v. *Reeves* (3 Id., 222). As adverse to the claim that to render competent the subsequent declarations of the assignor, on the ground of a conspiracy, the unlawful design should be first proved, he cited *Savage* v. *Murphy* (8 Bosw., 89, 90, HOFFMAN, J.) That the fraudulent intent of the assignor was sufficient to avoid the assignment, he cited *Rathbun* v. *Platner* (1 Hill, 272); *Wilson* v. *Forsyth* (24 Barb., 106); *Matthews* v. *Bellamy* (33 Barb., 127); *Seymour* v. *Wilson* (14 N. Y., 567); *Griffin* v. *Marquadt* (17 N. Y., 28); *Work* v. *Ellis* (50 Barb., 512). That the declarations of a vendor, which are a part of the transaction, or made under circumstances implying the assent of the purchaser, are competent evidence against the latter, he cited Cowen & Hill's Notes, 177, 179; *Farrington* v. *The Frankfort Bk.* (31 Barb., 183, 194); *Kent* v. *Harcourt* (33 Barb., 491); *Peck* v. *Crouse* (46 Barb., 151, 155, 156); *Keator* v. *Dimmick* (46 Barb., 158, 160–1); *Gibney* v. *Marchay* (34 N. Y., 301); *Fogg* v. *Child* (13 Barb., 246); *Ogden* v. *Peters* (15 Barb., 560); *Spaulding* v. *Hollenbeck* (39 Barb., 79); *Pierson* v. *Hoag* (47 Barb., 244); *Weber* v. *Kingsland* (8 Bosw., 415); *Valton* v. *Nat. Life Ins. Co.* (17 Abbott, 268); *Flemming* v. *Smith* (44 Barb., 554); *Thomas* v. *Beebe* (25 N. Y.,

244); *McKee* v. *The People* (36 N. Y., 116). On the general principle that the combination being established, all conversations and declarations relating to the general design by one conspirator are admissible against all, he cited, Cowen & Hill's Notes to Phillips' Evidence, note 180; 1 Greenleaf's Evidence, 187, § 111; *Crary* v. *Sprague* (12 Wend., 41); *Waterbury* v. *Sturtevant* (18 Wend., 354, 360-1); *Apthorp* v. *Comstock* (2 Paige, 482); *Jones* v. *Hurlburt* (39 Barb., 406); *Wilbur* v. *Strickland* (1 Rawle, 458); *Clayton* v. *Anthony* (6 Rand. R., 285); *Reitenback* v. *Reitenback* (1 Rawle, 362); *Commonwealth* v. *Crowninsheild* (10 Pick., 497); *United States* v. *Gooding* (12 Wheaton, 460-8-70); *Am. Fur Co.* v. *The United States* (2 Peters, S. C. R., 358, 365).

WOODRUFF, J. I concur fully in the proposition that after the execution and delivery of an assignment for the benefit of creditors, and the entry of the trustees upon the performance of the trust, by taking possession of the assigned property, the assignor cannot, by his declarations or admissions, out of court, invalidate the assignment or furnish evidence of his own or the trustees' fraudulent intent in making or receiving it, for the purpose of defeating the claim of the trustees to hold and administer the property according to the trust.

Where such is the purpose and proposed effect of the evidence, it will not do to say that testimony to the assignor's admissions is competent evidence as against him, and if his intent was fraudulent, the assignees, however free from fraud themselves, are not *bona fide* purchasers, but are affected by the fraudulent intent of the assignor.

This proposition, if conceded, does not make such declaration proof of the assignor's intent as against the assignees. If proof that the assignor intended to defraud will alone defeat the assignees' title, such intent must, in a contest with them, be proved by evidence which is competent as *to them*, or their title must prevail.

In such a contest, proof which establishes the fraudulent intent by evidence good as against the assignor only, does not contribute in any degree to defeat their title. On such evidence the assignees may legally say, as to us, the allegation is wholly unproved.

In the present case it is urged by the appellant, as assignee of William T. Cuyler (prosecuting to recover for property claimed to have been wrongfully taken on execution), that the conversations of the assignor, out of court, were erroneously received to establish that the assignment was made with intent to defraud the creditors of the assignor.

Without denying the rule above stated, the admissibility of the evidence upon this trial is insisted upon on other and distinct grounds, alleged to be in no conflict therewith, or, as to some of the declarations, they were of such wholly immaterial matters that they could not possibly have affected the verdict.

Among these grounds is this, that other evidence showed that the assignor and assignees were combined in a conspiracy to defraud the creditors of William T. Cuyler, and therefore the acts and declarations of either conspirator, while carrying the common intent into execution, and in furtherance thereof, are competent evidence to affect all the co-conspirators.

This rule is not questioned; its application, however, to this case is denied, and it is insisted that the rule itself assumes that the fact of conspiracy for an unlawful purpose is conceded or has been proved.

It is not and cannot be successfully claimed that mere proof that assignor and assignee have concurred in an assignment providing for the payment of debts, establishes a conspiracy within the rule. Delivering and accepting such an assignment establishes a common intent, but not a common intent to defraud. If mere proof of concurrence in the execution and delivery of the assignment established a common intent within the principle making the acts and declarations of the conspirators, while carrying their common design into execution, evidence against each other, then the rule first above

stated is made a nullity. No sooner is an assignment made than the assignor may, by his acts or declarations out of court, defeat it, if he be dishonest enough to collude with any creditor, or to resent any dissatisfaction with the trustees, and defeat it by such means.

To make such admissions or declarations competent evidence, it must stand as a fact in the cause, admitted or proved, that the assignor and assignees were in a conspiracy to defraud the creditors. If that fact exist, then the acts and declarations of either, made in execution of the common purpose, and in aid of its fulfillment, are competent against either of them. The principle of its admissibility *assumes that fact.*

It necessarily follows that those declarations or admissions cannot be received to prove the fact itself. This is quite plain. A species or form of evidence which is in its nature inadmissible, unless some prior or other fact is proved, cannot be received to establish the fact, proof of which is an indispensable condition of its own admissibility.

I speak now without any discussion of the order of proof or of how conclusive the proof of conspiracy for an unlawful purpose must be at the time when evidence of the declarations of conspirators is offered. I mean distinctly to say, that these acts and declarations are not, in any stage of the trial, to be received and weighed as evidence of the unlawful combination itself; to allow them to be so received and weighed is to hold them admissible, although the very condition upon which their admissibility depends is not satisfied.

There, I think, was the plain error into which Mr. Justice COWEN fell, when he wrote his opinion in *Waterbury* v. *Sturtevant* (18 Wend., 353). In that case, it was sought to set aside a conveyance by Jera Waterbury to Nathaniel Water bury as fraudulent. Judge COWEN was of opinion that a case of fraudulent combination had been shown, and that therefore the admission of the assignor (Jera) more than six months after such conveyance, when "on the jail limits," under the plaintiffs' execution, to the effect that the conveyance was

made to prevent the creditors collecting the judgment, was admissible to affect his father, the grantee; and, to use his language, " Jera's direct admission of the fraud may properly be added to the evidence as between Sturtevant (the plaintiff) and the father, if the case be not sufficiently clear without it." This declaration of the right to use the declaration of the grantor to establish the illegal conspiracy, without which there was no fraud affecting the father, was, I think, a misapprehension of the rule, and the Court of Errors, in refusing to concur in Judge COWEN's opinion for affirmance, reversed the judgment. The reversal was upon the ground that the illegal combination was not established, which was in effect a holding that the declaration of the grantor was *not* " to be added to the evidence as between the plaintiff and the grantee."

In case of conspiracy, where the combination is proved, the acts and declarations of the conspirators are not received as evidence of that fact, but to show what was done, the means employed, the particular design in respect to the parties to be affected or wronged, and generally those details which, assuming the combination and the illegal purpose, unfold its extent, scope and influence either upon the public or the individuals who suffer from the wrong, or show the *execution* of the illegal design. But when the issue is simply and only, was there a conspiracy to defraud, these declarations do not become evidence to establish it.

So far then, as the admission of the evidence in this case, of declarations, subsequent to the assignment, is sought to be sustained as evidence of the common fraud, on the ground of conspiracy, the argument wholly fails. A conspiracy cannot be proved against three, by evidence that one admitted it, nor against assignees by proof that the assignor admitted it; it is a fact that must be proved by evidence, the competency of which does not depend upon an assumption that it exists.

The judge, on the trial of this action, instructed the jury that it was proper for them to consider, upon the question of

actual fraud, the various conversations which had been given in evidence.

If the declarations in question are not admissible on any· ground except as declarations of the assignor after the assignment and delivery of possession of the property, or as declarations of a co-conspirator, then it was erroneous to receive them or submit them to a jury as proof of the fraud. The judge charged, that both assignor and assignees must have concurred in the fraudulent intent in order to render the assignment void; a proposition probably more favorable to the plaintiff than an accurate declaration of the rule would be; but this shows how the reception and submission of these declarations to the jury, as evidence of fraud, operated to the plaintiff's prejudice, if not admissible.

The declarations objected to consisted of a part of three conversations; one with Anson D. Smith on Sunday, the 30th of August, 1857. At that time, the assignment had been prepared and completed the day before, but had not been delivered to the assignees. William T. Cuyler had the entire possession and control of the property, and was at full liberty to allow the assignment to have effect or not. So far as this conversation was between the plaintiff and Smith and the assignor, it is not claimed to have been incompetent; it was the plaintiff's own conversation, or in his presence, so as to affect him. Now all that the assignor said, out of the presence of the assignee, was in reply to Smith's observation that he had heard that he (Cuyler) had made an assignment, viz: "He said he did not know how it should get out, because it was not known; but that he had made an assignment, and George (the plaintiff) would tell me all about it when we got to the house"—a very natural expression of surprise that rumor of his assignment had got abroad before it was in fact delivered, though executed; a frank declaration, nevertheless, of the truth. By no distortion that I can imagine can this be construed evidence of fraud; and although the judge, in submitting the whole conversation to the jury, did not except this from the conversation which followed between the

assignor, assignee and Smith, I should hesitate very much in saying that those statements could by any possibility have been regarded, either by the court or jury, as any evidence that the assignment thus spoken of was fraudulent. They tend rather to show the assignor's frank sincerity, and that is all. If the conversation which followed tended to prove fraud, the plaintiff was a party to it; the very subject of conversation was in the possession of the assignor and its transfer to the plaintiff, the matter before their minds. Whatever in that tended to show fraud, tended to show fraud to which both were parties, or at least of which both were cognizant.

Another portion of the testimony which the appellant insists was inadmissible, upon the grounds above considered, is the conversation between the assignor and Anthony M. Wooster, two months after the assignment. To understand the purport of this conversation, and its relations to the controversy, it should be stated, that a prominent claim by the defendants, in hostility to the assignment, was, that the assignor has not given up the possession or the control of the assigned property; that, although the form of transfer had been completed, he still managed the estate with intent that the assignment should serve the purpose of constraining creditors to compromise their claims or accept property in satisfaction thereof, and that the assignee, his son, was a mere instrument in his hands, obedient to his will and submitting to his control, and much testimony had been given, which the defendants relied upon as establishing this.

Now Anthony W. Wooster was a creditor; he had a conversation, about two months after the assignment, with the assignor and assignee, at the beginning of which the assignor only was present. It was while the great bulk of the property was on hand. The witness stated that he had a conversation with the assignor, and the plaintiff's counsel objected to proof of that conversation. Neither the precise ground upon which it might be deemed admissible, nor the precise ground of objection, were stated by counsel, but the witness was permitted to continue his narrative.

It follows that if, on any ground, it can be said to be competent on the question of fraud, by showing the assignor's continued control and dealing with the property, with the knowledge and assent of the assignee, it cannot be said to be improperly admitted.

What, then, was the conversation?

"Mr. Cuyler asked me if I had seen George (the plaintiff). I said I had; he said I had better go back; George wants to turn out property on your debt; I said I understood property had been levied on; he said that no property had been levied upon, except a little around the distillery; I said if I could hold it I should be glad; he spoke about turning out rye, barley in stack, and some calves; I said I would be glad to have them."

If this had ended the matter, I should have felt constrained to say, entertaining the views I have above expressed, that it was wholly incompetent, and ought not to have been received to affect the plaintiff.

But if the material fact and only material fact involved in it, viz., that he, the assignor, had been proposing that property should be turned out to the witness was at once communicated to the plaintiff, and the negotiation therefor was continued and consummated; then the objection disappears, because the plaintiff adopted it or acquiesced in it. In that view, it had a competent bearing on the question above stated, how far the assignor continued in the management and appropriation of the property, his son acquiescing and aiding therein.

The witness adds: "When we got into the house the Colonel (the assignor) said to George (the plaintiff), he had brought me back to take the property; he said *he* wanted to let me have rye and barley, and George said, had'nt you better take the calves? He wanted me to take potatoes and hay." The conversation continued, property was examined and a bill of sale was made out; on discussion about the price named, the assignor declaring that "he did not expect me to keep" the property; "that *they* could make more out of it, and would pay our debts."

* Now it is true that the very words of the conversation out of doors were not recited to the plaintiff, but what was said did communicate the substance and only point of the conversation to him, viz. : That the assignor had been negotiating with the witness for the turning out of property to him on his debt, and the plaintiff, upon that, acquiesces and co-operates in effecting it, the assignor still being the principal party urging and settling the terms of the transaction.

I cannot regard the admission of those preliminary propositions by the assignor, adopted and acted upon by the assignee, as inadmissible.

It does not appear by the case what precise view was taken of this at the trial, but it does not appear that it was received or treated as in the nature of an admission or declaration of the assignor that the assignment was fraudulent. The judge told the jury that they might, on the question of fraud consider this turning out of rye, barley, cows, calves, &c., as testified by Anthony M. Wooster, without any expectation that Wooster would keep it. So far as it tended to show the continued control of the assignor over the property, or a design to treat the assignment and transfer to Wooster as a mere cover until the assignor should pay the debt and take back the property, it was clearly admissible. It was not at all conclusive, and was not so treated, but it formed a part of the history of the dealings of the assignor and assignee with the property, which it was competent for the jury to consider.

The only other conversation of the assignor, which is claimed by the appellants to have been improperly received, was had with William B. Wooster, one of the assignees, and one of the original plaintiffs in this action. The conversation was about six weeks after the delivery of the assignment.

It unquestionably tended in some degree to show that the assignor was active in the management of the property, was concealing some of the property even from one of the assignees, was desirous of retaining some from the reach of executors, that it might furnish means of contending with creditors and otherwise, was well adapted to create the

impression of bad faith on the part of the assignor, and in some slight degree on the part of his son. Indeed it is conceded by the counsel for both parties (in substance if not in form) that this testimony tended to show fraud.

If William B. Wooster is to be regarded as a third person, not involved in this controversy, and those declarations are to be judged of as if made to a stranger, and therefore offered nakedly as admissions or declarations of the assignor, then, for the reasons that I have given at some length, I deem them wholly inadmissible, and the judgment should be reversed for the error in receiving them and submitting them to the jury as bearing upon the question of fraud in the assignment to defeat plaintiff's title.

It appears by the statement of the case appended to the appeal book, that he was removed from his office of assignee on the 20th of May, 1858, after this conversation and after this action was brought, but before the trial. Although the order is not printed, the counsel for both parties seem to concede his removal by their briefs; and on the trial, and in connection with this testimony, he was called a removed trustee.

A conversation between him and the assignor cannot be given in evidence as involving either an express or implied admission of the truth thereof by a party to the action. In that aspect, the conversation would stand on the same ground as his own declarations, which were, in fact, rejected, when offered on the trial.

Was the conversation admissible as involving his (Wooster's) assent to what the assignor said, on the ground that he was then acting as assignee and held the legal title to the property, of which he had, before the trial, been divested? The action relates to personal property only, of which he then had the possession jointly with the plaintiff, if they ever had any actual possession, and upon that naked question, I think the proof sufficiently shows that they took possession.

But, 1st. The conversation imports no admission by Wooster, of any fraud in the assignment, but the contrary. It consisted, on his part, of inquiries and, perhaps, complaint

that he was not permitted due control of the administration of the property and an intimation of an intention to resign, to avoid the censure of creditors, for not proceeding more rapidly in the execution of the trust.

2d. If it could be construed into an implied admission, or an acceptance of the assignor's statements, and whatever indication of fraud was imputed thereby, the question becomes somewhat complicated.

It is well settled in this State, that the admissions or declarations of a former owner of personal property are not admissible to affect the title of a purchaser from him.

And, for the purposes of this case, it is not necessary to hold that, where a transfer is sought to be impeached, on the ground that it was fraudulent, the admissions of the assignor, while continuing in the possession of the property, not having consummated it by an actual surrender of the property to the transferee, are incompetent as evidence of the fraud. (*Adams* v. *Davidson*, 10 N. Y., 309, and cases there cited, and in Notes to Phil. Ev., p. 602.) Whatever may be thought of the correctness of the rule stated in *Adams* v. *Davidson*, it is not necessary to the decision of this case that it be disregarded.

Apart from the claim strenuously insisted upon by the defendants, on the trial and here, that, in truth, Wooster never had the actual possession of the property, I do not think the cases cited reach the present question; and it is quite clear that the testimony was not received upon any such ground, but simply as the declarations of William T. Cuyler, the assignor, and, as his declarations, I have already said they were not admissible.

So far as the plaintiff holds, he holds not in a just sense under Wooster, but under the assignment. The removal of Wooster leaves him sole assignee; and there is no pretence that the change wrought by such removal was fraudulent, and the effort of the defence is not to impeach that, by showing that before it was consummated, Wooster made admissions invalidating it.

To illustrate: Suppose that Wooster had, even in an application to the court to be permitted to resign, stated in terms, that William T. Cuyler's assignment, by which he was made trustee, was made for the purpose of defrauding his creditors, would that, after his resignation, have been evidence against his co-assignee, who maintained the assignment and insisted upon its honesty? Or, suppose he had so stated in an answer to a petition for his removal, would such statement have been evidence? I think not. And, if not, then any inferences derivable from declarations of the assignor in his presence are not to be permitted.

Both he and the assignor are competent witnesses, by whom to establish the fraud, and their testimony, under oath, and not their declarations or admissions, should be resorted to, to establish the fraud.

I have considered the only other ground upon which the counsel for the appellant urged a reversal of the judgment, viz., the charge of the judge, wherein he instructed the jury that they might take into consideration various facts which appear in evidence, to wit:

The delivery of $4,800 by the assignor to his wife, two days before the assignment; the provision in the assignment for the payment to his son, of $8,000, for his services; the clandestine removal and secretion of property immediately after the sheriff had visited the premises; and the falsehood and deception attempted through one of the witnesses, De Bow, manifestly intended to defeat or prevent a levy, and some other dispositions of property, having that apparent object; and, finally, the transfer of the distillery to a late servant of the assignor.

These were transactions which the court charged might be considered, but he charged, also, that the explanations thereof must also be considered.

If the jury believed the explanations, and, therefore, that the payment to the assignor's wife was the payment of a just debt, and that the other transaction were with a view to the maintenance of a just title to the assigned property,

they would attach no importance to the circumstances mentioned But the argument of the appellant, to a large degree, assumes, that the jury were bound to believe the explanations, and, therefore, these circumstances were not to be considered at all.

It is undoubtedly true that an assignment, honestly made for a lawful purpose, cannot be defeated by proof that the assignees abused their trust, misappropriated the property, or acted however dishonestly in its disposal, or that they took unwise or even apparently dishonest means to preserve the property from litigation or levy by a creditor who, in such case, has no right to seize it.

But, when the question is whether the assignment was made with single desire to appropriate the property to the payment of creditors, the immediate conduct of the assignees on taking or professing to take possession, their acts when they find that the good faith of the assignment is questioned, and especially when there is some evidence that they are acting under the advice, if not control of the assignor himself and under a suspicion not entirely without evidence, that the purpose of the assignment was made in order to prepare the way for compromises, and constrain creditors to take property at prices to be fixed, in satisfaction of debts, in lieu of money, I think these, and all like circumstances, should be permitted to go to the jury, with the explanations thereof, for their consideration.

But, on the ground above stated, I conclude that the judgment must be reversed and a new trial ordered.

DANIELS, J. (dissenting.) A very large number of exceptions were taken, on the part of the plaintiff, during the progress of the trial of this cause, and to the charge of the court, by which it was finally submitted to the jury. These exceptions chiefly relate to the admissibility of evidence which was offered by the defendants, and received by the court as tending to establish the conclusion that the assignment, under which the plaintiff derived title to the property in dispute, was made

to hinder, delay and defraud creditors, and was afterwards used for that purpose. So far as they were earnestly pressed upon the consideration of the court, by the learned counsel for the plaintiff, they are confined to the evidence showing the acts and declaration of the assignor concerning the object of making the assignment itself, and the manner in which the assigned property was managed and controlled, after it has been made. For the purpose of determining whether the evidence received under these exceptions was properly admitted or not, it will become necessary to ascertain, in a general manner, the situation and condition of the case, when that evidence was given. The assignor had been, and was at the time when he made the assignment, extensively engaged in business as a distiller, and for several days previous to that event, had contemplated and finally concluded upon making a general assignment of his property. Before doing so, he informed the plaintiff, who was his son, and the general managing agent of his business, that such was his purpose. And the evidence given by the other assignee, who appeared to be one of his confidential friends, showed that he had conversed with him upon the same subject. This conversation, as well as the statements made by the assignor, during the progress of it, were received in evidence without objection. And, as far as they can properly be extended in that direction, may be considered as exhibiting the object the assignor had in view, and expected to accomplish by means of the assignment and the management of the assigned property under it.

In this conversation, the witness testified that William T. Cuyler spoke to him about being one of the assignees, and told him that his debts were more than he could pay; that he could not make the interest, which was fifteen thousand dollars a year; this was three or four days before the assignment was made; at that time this witness, Wooster, says that he was the owner of real and personal property, and was on the assignor's paper as indorser to the amount of sixty or seventy thousand dollars, which he was anxious to secure;

he had also indorsed the paper of other persons in comparatively small amounts; he further stated, that at that time, the assignor asked him if he could not arrange it so that the persons he was indebted to could not get anything from him; that he wanted to make him as poor as he could, and he, the assignor, could arrange it easier with his creditors; the witness did thereupon convey a portion of his property to his mother, and another portion to his brother, which left him the owner of a warehouse in Piffardinia; and then he said Cuyler asked him if he could not fix that in some way; that Cuyler said he did not want them, alluding evidently to the creditors, to get anything from the witness, and said he wished to make him as poor as he could; all this transpired before the assignment was made, and while it was in contemplation, if this witness was to be believed, and that was a matter strictly within the province of the jury; and it leads to the direct and obvious conclusion, that the assignor desired the assignee to be stripped of his property, for the purpose of embarrassing and depriving his own creditors of it, so that he, to use his own language, " could arrange it easier with his creditors." The manifest object was to place them in such a condition that they would be hindered and delayed, and thereby coerced into such terms of adjustment as the debtor should deem proper to extend to them; that this was his plan is clearly indicated by the language he made use of; and it is equally as clear that the assignment he was about to execute was designed as one of the instruments which was to be used in the execution of that plan; and this witness seems to have willingly lent himself to the assignor so far as he required him for the accomplishment of that design; for he at once divested himself of all his real estate except his warehouse, and that did not exceed the sum of eighteen hundred dollars in value; as to these two persons there was evidence therefore so far tending to show that they had confederated together to defraud the assignor's creditors, in part, at least, by means of the assignment, as would have justified any jury in finding that to be the fact. And no change was shown to

have been made in that design before the assignment itself was executed and delivered; after that there were some indications that the mind of this witness did undergo some change in this respect, but none that the assignor entertained any reluctance upon the subject; but if the witness Wooster did afterwards decline to aid in executing the fraudulent purposes of the assignor, it was at so late a period in the transaction as to have no influence upon the admissibility of the evidence excepted to by the plaintiffs.

The evidence tending to identify the plaintiff, who was the other assignee, with the same unlawful purpose, is quite as direct and equally as satisfactory as that connecting Wooster with it. The plaintiff was the assignor's son, and Wooster testified that he had no property, to his knowledge. When the assignment was proposed, he thought they could go through without it, and opposed the making of it. But when it was made, he accepted the trusts created by it, as one of the assignees, and continued in the charge and management of the assignor's business, the same as he had previously done; and no visible change in that business appears to have been afterwards made, down to the time when the personal property was levied upon by the sheriff. This was a circumstance which certainly indicated that the plaintiff's purpose was not to convert the estate into money and distribute it among the creditors, in compliance with the duties imposed upon him by the trust. At least, a jury would be at liberty to place that construction upon it; and if they would, inasmuch as the assignor's interviews with Wooster indicated it to be his purpose to arrange his property in such a manner as would enable him to "arrange it easier with his creditors;" and the relation of the plaintiff to him and to his business rendered it probable that this purpose had been communicated to him, the inference would not be an unreasonable one, that the plaintiff carried on the business in the manner which he did, with the intention of promoting that end. But his connection with the unlawful design of the assignor does not depend alone upon that circumstance; for the witness, Smith,

says that he had an interview with the plaintiff, and also with his father, upon the subject of this assignment, on the 30th day of August, which was the day preceding its delivery, and, therefore, at a time when the declarations of the assignor, disclosing the object he had in making the assignment, were rendered admissible evidence against the assignees, within the ruling of this court, in the case of *Adams* v. *Davidson* (6 Seld., 309). But the principle affirmed on that occasion is not very important in this connection; for the substantial and important part of the interview mentioned by this witness was had in the plaintiff's presence, and received his approbation and assent. This witness stated that he first met the assignor and told him he had heard bad news; that he had heard that the assignor had made an assignment. The latter responded that he did not know how it could get out, because it was not known; but that he had made an assignment, and George would tell him all about it, after they had got into the house. After going into the house, he said to the witness: " You are all right; we have taken care of you; you are provided for in the first class." This appears to have been all that was said by the assignor when the plaintiff was not present; and as that did not tend to prove the existence of any unlawful design, either on the part of the assignor or the assignees, it could not possibly be productive of any injury whatever, if it had not been strictly admissible as evidence. It was simply introductory to the more important statements which the witness testified were made to him when the three came together; then he said he had conversation with both the plaintiff and his father, and that " George stated that his father had made an assignment and appointed him and Wooster assignees; that the object was to turn out real estate and shape it up; and that the reason was that a man by the name of Forbes had sued him for $6,000 or $7,000, and that he had looked over and did not owe him that amount." The plaintiff said: " The boys will want you to take property, and that it will be all right; we calculate to pay one hundred cents on the dollar; we can't pay all, and

I want you to assist the boys in settling it up." He "did not want us to say anything about the assignment until it was made known otherwise, or what passed between us in regard to assignment; that he wanted to arrange with other creditors by turning out property." This witness then added that the plaintiff came to Perry to see himself and his father a few days after this interview; upon this occasion he said that "George said they wanted to contrive to save the distillery property, and let father" take it. "George said it was valuable property; if they could save that, they did not care about the rest; George said he wanted to save it for his own benefit." The plaintiff proposed to turn out this property to the father of the witness for $19,000, saying that it was worth a great deal more money, that it cost $30,000; and the plaintiff further stated that he and Slocum would take it back again; the witness testified further, that the colonel, the assignor, "and George were anxious to get it into some shape so that George could run it." "They requested us to assist them in settling up; and they could settle up if father would take the distillery property, it would be a starting point; they wanted to include as much" property "as they could without having other creditors think they were putting too much in father's hands." "I think this conversation was with George." He said: "It would be necessary to keep it to ourselves." And on that day, which was the 17th day of September, a contract was executed by the father of the witness agreeing to sell and convey the distillery property to the plaintiff and Slocum for the sum of $19,000, in case he should acquire the title to it from the assignees.

If this witness was to be believed, and that was a matter for the consideration of the jury, the plaintiff did, before the assignment was delivered, become a participant in his father's purpose of hindering, delaying and obstructing his creditors in the collection of their debts. And afterwards endeavored to carry that design into effect. So far as this evidence showed what transpired after the assignment was delivered, it was pertinent to the inquiry involved in the trial of the

action, for it tended to show the intent which existed before and at the time when the assignment was delivered, and also that this intent was afterwards attempted to be carried into execution.

The evidence already referred to, standing alone, was of so direct and satisfactory a character that a jury would be at liberty to conclude from it, that the assignor and the assignees were united in one common intent to hinder and delay the assignor's creditors, by means of this assignment and their management of his property under it. And after that was shown to be the *prima facie* condition of the case, the acts and declarations of these parties, whether separately or unitedly performed and made, were admissible against the plaintiff, for the purpose of more conclusively establishing the fraudulent character of the assignment, as well as the execution, or attempted execution of the fraudulent design that led to the making of it. This evidence, it is true, did not bring the present case, in this respect, within the dictum of Justice WELLES in the case of *Jones* v. *Hurlburt* (39 Barb., 409). What was said as to the rule of law applicable to this point on that occasion, was not essential to the decision of that case. For the evidence concerning the alleged combination was insufficient even to warrant a practical presumption in favor of its existence.

In this respect, the evidence in the present case was of an entirely different character. It was sufficient, in the absence of any countervailing testimony, and nothing of that nature was given on the part of the defendants, fairly and reasonably, to lead to the conclusion that these three persons did combine together for the execution of a fraudulent and unlawful design, and that the assignment was made and delivered, in order to render that design effectual. And after that had been presumptively established, the acts and declarations accompanying such acts, of each of the persons so shown to be combined, were admissible against all or any of the other parties to the combination, so far as they were performed and made in the execution of the common purpose. This is the

rule,. as· it is stated by GREENLEAF, in his work upon evidence. He says: "A foundation must first be laid by proof, sufficient, in the opinion of the judge, to establish *prima facie* the fact of conspiracy between the parties, or proper to be laid before the jury, as tending to establish such fact." (1. Greenleaf, § 111.) The same rule is mentioned in the note to the passage in Phillips, which states the principle of evidence prevailing in this class of cases. It is there said that "in such cases it is necessary that there should be given, at some period of the trial, sufficient evidence to go to the jury, of concert and connection on the part of the prisoner." (1 Phillips on Evidence, 199, note 5.). In the case of *Clayton* v. *Anthony* (6 Randolph, Va., 285), GREEN, Justice, stated the rule to be, that "it is well settled that in the case of several combining for an illegal purpose, the acts and declarations of each, in respect to the common object, are evidence against the others; yet, before such evidence can be admitted, the court must decide for itself that there is sufficient evidence *prima facie* to prove such combination, which the jury may, nevertheless, negative." (Id., 301.) Judge McLEAN stated the rule in the same manner, in the case of *The United States* v. *Cole* (5 McLean, 513, 601–2). His language was, that "where *prima facie* evidence has been given of a combination, the acts or confessions of one are evidence against all. This rule of evidence is founded upon principles which apply to agencies and partnerships. In *Rex* v. *Stone* (6 Tenn., 527), evidence that would be sufficient for the jury to consider whether the prisoner was not one engaged in a conspiracy, was held to be sufficient to let in proof of the acts and statements of the other parties to the conspiracy. (Id., 528.) The same rule was maintained in *Preston* v. *Bowers* (13 Ohio N. S., 1, 13); *Commonwealth* v. *Brown* (14 Gray, 419, 432); *Kimmell* v. *Geeting* (2 Grant, Pa., 125). In the last case, it was held, that a division of profits of a fraudulent transaction was· sufficient, because it was some evidence of a combination to defraud. And in *McDowell* v. *Rissel* (37 Penn., 164, 168), slight evi-

dence of collusion was held to be all that could be required. And this was affirmed, also, in the cases of *Peterson* v. *Speer* (29 Penn., 479, 491); *Clinton* v. *Estes* (20 Ark., 216); *Johnson* v. *State* (29 Alabama, 62, 68); *Browning* v. *State* (30 Miss., 656). And *Evans* v. *Watson* (56 Penn., 54), is, also, to the same general effect. (See, also, 6 Eng. Com. Law., 123, 128.) And the decisions made in *Benham* v. *Cary* (11 Wend., 83), and *Craig* v. *Craw* (12 Wend., 41), maintain the same principle.

This rule is not confined to cases where a technical conspiracy forms a portion of the charge; but it includes all combinations formed for the purpose of accomplishing unlawful results, or lawful results by unlawful means. (*Comm.* v. *Pierson*, 8 Gray, 375, 381.) And under it, all such acts and declarations as may be performed or made for the purpose of carrying the unlawful design into effect, are properly admissible as evidence, after the existence of such a design has been presumptively established, whenever the execution of the design may constitute a pertinent subject of judicial inquiry. (2 Starkie on Ev., 401, 403; *Am. Fur Co.* v. *U. S.*, 2 Peters, 364–5; *Page* v. *Parker*, 40 N. H., 47, 62; *Lee* v. *Lamprey*, 43 Id., 13, 15.)

The evidence which was given upon the trial of this action, showing acts and statements accompanying them, after the delivery of the assignment, was clearly within this rule. For it tended to establish the performance of such acts, and the making of such statements as indicated the execution of a common fraudulent intent, to which the assignees as well as the assignor were parties.

Anthony M. Wooster, a witness sworn on the part of the defendants, testified that he met the assignor at his brother's house, early one morning, about two months after the assignment was made. On that occasion, he testified that "Mr. Cuyler asked me if I had seen George. I said I had. He said I had better go back, ' George wants to turn out property on your debt.' He said no property had been levied upon, except a little around the distillery." "He spoke about turn-

ing out rye, barley in stack, and some calves." "When we got to the house, the Colonel said he brought me back to take the property ; said so to George. He said he wanted to let me have the rye and barley ; and George said, 'Hadn,t you better take the calves.' He wanted me to take potatoes and hay. We looked through the barn and stacks. The rye and grain was to be thrashed and delivered at my warehouse. The potatoes were to be put in Col. Cuyler's cellar. We went to the house, and a bill of sale was made out. I objected to the price. Colonel said he did not expect I would keep it; that they could make more out of it, and would pay our debts. Colonel said George had better have Alfred drive down the good cows; one for Marsh, one for William, and one for himself. He said he would pay me for keeping cows and calves, or make it all right. I told them where to put them, and they were driven there." J. D. Crank testified that he had some goods of the assignees. He had a few barrels of whiskey after the assignment. In September or October, there were three or four barrels came over. C. H. Cogswell testified that " a quantity of whiskey was taken away; twenty-five to thirty barrels were taken to Mrs. Phelps' barn and my cellar ; ten or twelve barrels taken to my cellar." Lemly also swore to whiskey and mules being taken away in a similar manner, on the twelfth of October. These transactions, and some others not quite so significant, appear to have been brought about by the co-operation of the plaintiff and the assignor; and they all indicated the existence and execution of a common intention to deprive the creditors of the property which, according to the terms of the assignment, had been expressly devoted to the payment of their debts. (*Verplank* v. *Sterry*, 12 John., 536, 559.) In that view, they had a tendency to materially strengthen the inference arising out of what was shown to have transpired about the time when the assignment was made ; and that the object of making it was to defraud creditors. This evidence was more important than the mere isolated acts and declarations of either one of the parties, standing alone, could

have been. For it went to establish the conclusion, that what was done in that respect, was performed by the united action of the plaintiff and the assignor, and, as such, it was clearly admissible upon the trial. In this respect, it differed from the acts and accompanying statements of individual conspirators, which are only pertinent upon the subject of the execution of the common design, and can only be considered after that has been found to have been established. (*Wiggins* v. *Leonard*, 9 Iowa, 194; 13 Ohio, 13, *supra*.)

This case was tried upon a more favorable theory for the plaintiff than the defendants were legally required to maintain; and that was, that the assignment could only be shown to be fraudulent by showing that the assignees participated in the assignor's intent to defraud. It was chiefly to show the fraudulent intent of the assignee that this evidence was given, and to connect him with the fraudulent design of the assignor. This was unnecessarily onerous upon the defendants, because it imposed upon them more than, in any view of the case, the law could require from them for the purpose of making out their defence. It could not, by any possibility, injure the plaintiff, and he therefore has no right to complain of the evidence unnecessarily given to maintain it. It is sufficient that it was pertinent to that view of the law, and that it had a direct tendency to maintain the theory on which the defence was placed.

The exceptions taken to the charge in submitting these circumstances to the jury are fully answered by what has been said upon the subject of the admissibility of the evidence concerning them. They were proper subjects for the consideration of the jury. And so was the delivery of the $4,800 to the assignor's wife, just before the assignment, and the preference created in the assignment for the benefit of the plaintiff. Together with all the other circumstances, they had some tendency to indicate that the assignment was neither fair nor honest.

The judgment should be affirmed.

HUNT, Ch. J., MASON, GROVER, JAMES and MURRAY, JJ., were for reversal on the ground stated in WOODRUFF, J's. opinion.

LOTT, J., concurred with DANIELS, J., for affirmance.

Judgment reversed and new trial ordered.