Fish, J.
The amended complaint set out out three causes of action. It is not important to inquire whether or not the facts stated in the two first counts named, did, when suit was brought, constitute good grounds for action *450 in favor of Bunnell, the plaintiff’s intestate, because, since its commencement, Bunnell died, and the first two stated causes of action are held to have died with the person, and do not survive or continue to his administrator. See Brackett v. Griswold, 103 N. Y., 425; 4 N. Y. State Rep., 119.
The same authority held that the count for the con spiracy to cheat and defraud, constituting the third ground of action stated in the complaint, did survive the death of Bonnell and continued in his personal representative; and, although at the last trial, had before that decision upon that count, the verdict was for defendant, yet the court sent the case back for a new trial on that cause alone.
It became, simply, a question of fact, upon the trial, whether or not the substantial allegations of said third cause of action of the complaint was sufficiently proved.
If the proof, taken as a whole, with all its proper bearings, is sufficient to admit of the fair inference that the “Iron Mountain Company of Lake Champlain” was a fraudulent scheme, conceived in sin; and invented and organized and advertised by its projectors for the purpose of deceiving the public and any and all persons who might give it credit; that a part of the scheme was to name a large capital, the shares of which were to be and were issued to the full amount of the capital in payment of the purchase price of a piece of property of small value, so that the apparently, paid up capital would be forty times greater than the value of the assets, and intending thereby to create the belief among the people that the company was possessed of real estate and property worth the full sum of the capital, when, in fact, it was worth but a very small sum; and the object to be attained by the scheme was to establish a good credit, so that business men would be likely to give it credit; that the defendant participated in such fraudulent proceeding and design; that thereby the company did acquire a credit and standing of solvency, so that the plaintiff’s intestate, upon that credit, parted with value and took the notes of the company, believing them to be good, when, in fact, the company was already insolvent, or on the highway to insolvency, and so that he was unable to collect pay of the company, then this defendant is liable and ought to pay the plaintiff’s debt; and the verdict of the jury ought to be upheld.
Without referring in detail to the evidence, after a careful reading, there is little room to doubt the justice of the verdict.
It was not necessary, to sustain a recovery, that any direct representation of a false or fraudulent character had been made by the company, or by defendant to plaintiff m *451 person, or that the fraudulent intent related to plaintiff, or had in view a design to defraud him in particular, if the design was to get such advantage of any person who might deal with them, and the plaintiff’s intestate became one of the victims, then the law will give him a remedy against anyone or all of the parties who set the machinery in motion Newbery v. Garland, 31 Barb , 121; Morse v Swits, 19 How. Pr., 275; Placer v. Minster, 65 N. Y., 89; Hubbell v. Meigs, 50 id., 480.
In the trial of this class of actions, it is difficult to lay down any rule in relation to proof as to what may or what may not be admissible as bearing upon the main charge. Each case is almost sui generis in that regard. Fraud or fraudulent intent is seldom proved by direct and open statements. Those who engage in it are supposed generally to attempt -concealment and endeavor to smooth over and cover the «vil intent.
Conspirators are much more likely to make open proclamations of good intentions, at the same time they are working to a different end.
Fraud, therefore, is only developed by circumstances and surroundings.
Sometimes a concurrence of trivial circumstances, tending to establish the charge, has much weight,, where each, separately, might be deemed of no value; and it is held competent to prove subsequent acts, not for the purpose of showing that the plaintiff was deceived by such subsequent acts, but because sometimes, when the curtain is lifted, light is thrown backward over the track in which the offending party has traveled.
So, in this case, all the acts and doings of either of the parties, apparently acting in concert and relating to the general subject out of which the alleged wrongful conduct grew, and the acts and doings of the corporation as such, and of its executive officers, under the inspiration of indidividual actors, each and all of them become the subject of examination and inquiry.
■ If any of the proceedings proved, fairly construed, tend to show good faith and honest intentions on the part of the actors then no harm results to the defendant from any such evidence. If such acts tend the other way, or if they are of a character that, considered in connection with other facts and circumstances, a part of the general history of the business, different minds might draw different conclusions, then such evidence is proper to go to the jury for their consideration, so that such force may be given, or such inferences may be drawn, as the conscience of the jury shall be convicted.
A chain of circumstances is developed by the evidence *452 in this case, which is scarcely explainable upon any theory of honest purpose on the part of the actors.
The Iron Mountain Company was organized as a corporation in 1869. At that time, a corporation known as the “Kingdom Iron Ore Company” was in existense, so far as it appears, in condition for business, unless it was for lack of pecuniary means with which to prosecute the business. Its capital stock was $200,000 which had been issued to pay the purchase price of a tract of rough mountain land consisting of about 1,400 acres, worth about' five dollars an acre. That company had no other property. It was subject to a mortgage of $25,000, given by some former owner, and the company itself had encumbered it by an issue of mortgage bonds to about $100,000.
The defendant, although not one of the directors of the company, was a stockholder and interested, his father and .business partner being at the time one of the directors.
That was the condition of the Kingdom Ore Company, when it was proposed to organize the new company, whose charter is involved in this action. i
It had stood but the brief existence of two years, and was in just as good a condition to develope the enterprise as a new company could be. If the real estate was worth $2,-000,000, the company was abundantly solvent. All the company had to do was to satisfy the monied world of the great value of the property, so that untold millions were likely to be found in the bowels of the earth, to enable them to confront the men of money, and business men, with success.
Then the first pertinent question arises: Why was a new company needed to be constructed and endowed upon the ruins of the old one, unless there was some sinister secret purpose and end to be accomplished by some more glittering scheme, through which the value of this block of land might by some means be so inflated as to get before the world a fictitious value; and so that business men, who were unwilling to accept the obligations of the old company, might be gulled into the belief that the security was largely ample.
The changing of the title to a new company did not give it any increased value.
With no other apparent object in view, the Iron Mountain Company was organized; the capital named at two million dollars; and the whole of it issued to the Kingdom Company (or rather to Remington, who acted as the middle-man or conduit) in payment of the price of land; so that the whole property of the new company was just that block of land and nothing more. It was not worth in the market more than five dollars per acre. It was in fact sold to a- *453 stranger, at a public sale, upon the senior mortgage of $25,000, in the year 1873, for $5,800, with all these wealthy men looking on and refusing to take it at any sum beyond that.
Then the Iron Mountain Company proceeded to mortgage .the property for a large sum to secure bonds to be issued; and put out advertising circulars, representing that the company had a paid up capital of $2,000,000; owned real estate of immense value, thereby seeking to attract the attention of men who had money to lend and business men who had goods to sell.
The defendant was one of the directors, and so continued, and joined in making the reports and in advertising the general solvency of the company.
The jury were not bound to accept the testimony of the defendant in his own behalf, to the effect that he believed the land to be of the full value of the capital stock; that he believed the reports signed by him were correct, and that he had no intention of misleading anyone, etc.
It is to be assumed that he was a man of ordinary intelligence with ordinary business capacity, and was likely to use that degree of caution usual among business men; and the jury might, with good reason, conclude that a business man and business men of the character of all those who were engaged, could not honestly believe that a block of land which could not be sold at more than $6,000, and which really had no market value, was worth $2,000,000.
The conduct of the company, and of its projectors and directors after organization; the loose profligate manner in which items of stock were parceled out and given away to induce men of sound business character to lend their names as directors, and thus to help to boom the value of a comparatively worthless property, and to create a fictitious credit to the company, manifest a lack of honesty and good faith, the ear marks of which are very plainly visible.
The plaintiffs intestate accepted the notes of the company in the belief that it was wealthy and had a genuine paid up capital, either in cash or its equivalent. The men who lent themselves to the project, which resulted in inducing him to rely upon its credit, ought to make him good.
It is not necessary to hold, or for a jury to find, to enable plaintiff to recover, that it was the intention of the defendant and his associates, actually in any event, to defraud its customers.
If these men engaged in the enterprise as stated, with the intent of trying an experiment, with the intention of creating a fictitious credit to the company and thus obtain the means of experimenting with the lands in testing its mines, expecting in case of good success to share the profits, *454 but in case it resulted unprofitable to let it go down and the creditors suffer the loss,—such a plan of operation would be equally mala fldes and equally a fraud upon the creditors, and ought to render the operators individually responsible.
There are certain propositions which always prevail in cases of this kind.
Where there is sufficient evidence of a conspiracy established between two or more persons, with a certain end in view, then the acts and declarations of each of the conspirators are regarded as the acts of the whole party, and are evidence against the whole party; (Dewey v. Moyer, 72 N. Y., 70; Cuyler v. McCartney, 40 N. Y., 221;) and where the fraudulent scheme is shown, and the parties to it set it in motion and employ agencies and employes with the semblance of authority, to develope and carry on the enterprise, the acts and sayings and doings of such agents and employes, while so engaged, are the acts' of the original conspirators. 1 Grreenleaf Ev., sec. 111.
There was no error committed on the trial, nor, is there room for any valid exception to the clearly expressed and well digested charge of the learned judge at circuit, or in the disposition made of the several requests to charge, by the respective parties.
The judgment should be affirmed, with costs; and order denying motion for new trial affirmed, with ten dollars costs and disbursements.
Parker, J., concurs._