## SUPREME COURT — APPELLATE DIVISION — SECOND DEPARTMENT.

### April, 1923.

## THE PEOPLE v. FRANK DE MARTINE

### (205 App. Div. 80.)

TRIAL—CONDUCT OF TRIAL JUDGE AND INSTRUCTIONS WERE UNFAIR AND IM-
PROPER AND JUSTIFY NEW TRIAL.

A new trial will be granted in a prosecution for robbery, where it
appears that the trial judge interrupted the cross-examination of the
prosecuting witness and admonished him not to answer questions not
asked and in a colloquy with defendant's counsel stated that the defend-
ant would have to disprove the assertion of the witness that the defend-
ant was the man who committed the robbery; that the judge in his
charge misstated testimony given by the defendant and refused to cor-
rect his misstatement when objection was made; that he eulogized the
district attorney and stated that the district attorney would not ask
for a man's conviction unless he believed he was guilty; that he stated
that the defendant's attorney had interposed a very energetic and
belligerent defense and had subjected the prosecuting witness to a most
excruciating examination; that he stated that the result of the cross-

examination of a child was to break down the child's memory and inti- mated that the testimony by the child on the direct examination was correct; that he stated that the prosecuting witness could not speak the English language fluently, although there was no testimony that he spoke any other language; that in discussing the testimony of the prosecuting witness and another witness, he intimated very strongly that in the mind of the judge those witnesses told the exact truth, and that he, in effect, stated that more convincing evidence could not have been secured on the part of the prosecution, unless the People had been present with a camera and a phonograph and taken a picture of the crime and recorded every word spoken.

Although the evidence of guilt may be strong, the judgment should not be affirmed, for the errors committed by the trial court prejudiced the substantial rights of the defendant.

APPEAL by the defendant, Frank De Martine, from a judg- ment of the County Court of the county of Kings, rendered on the 14th day of August, 1922, convicting him of the crime of robbery in the first degree as a second offense.

The indictment herein charged the defendant with the crimes of robbery in the first degree as a second offense, grand larceny in the first degree as a second offense and assault in the second degree as a second offense. The jury rendered a general verdict of guilty as charged in the indictment. The defendant was sentenced to twenty years' imprisonment in State prison.

*Jacob Sheintag,* for the appellant.

*Henry J. Walsh, Assistant District Attorney (Charles J. Dodd, District Attorney,* and *William F. X. Geoghan, Assis- tant District Attorney,* with him on the brief), for the respond- ent.

JAYCOX, J.:

Undoubtedly the learned county judge before whom this indictment was tried intended to be eminently fair and to secure to the defendant all of the protection which the law

accords a defendant upon trial on a criminal charge. Nevertheless the learned court gave the trial a trend which was seriously detrimental to the defendant. From the beginning of the trial until its end the remarks of the court, the questions asked by him, testimony erroneously admitted and the charge all tended to convince the jury that the defendant on trial was guilty. The attorney for the defendant was undoubtedly young and inexperienced and his conduct at times did not exhibit the courtesy toward the court to which it was entitled. This, however, may serve to explain but it does not justify the court's conduct of the trial. Under these circumstances the court should have been more than ordinarily solicitous to see that every right of the defendant was protected and that his attorney did not jeopardize his position before the jury by the manner in which he conducted the defense. Instead of doing this, the court, in reply to improper remarks by defendant's counsel, made equally improper remarks himself. He contrasted the lawyer for the defense with the prosecuting attorney to the detriment of the defendant's counsel and in the course of his charge he placed the testimony of each of the witnesses for the prosecution in the most favorable light and concluded his review of the testimony by practically asserting to the jury that nothing more could be produced without the aid of a camera and a phonograph.

Upon the trial the officer who arrested the defendant was called and testified that he was told by the defendant that on the night in question, June .24, 1922, he was with one Jackerino, in New York (borough of Manhattan). The officer stated that he saw Jackerino, then saw the defendant again and told him that Jackerino said the defendant was not with him and the defendant said nothing. This testimony resulted in getting before the jury hearsay evidence to the effect that the defendant had made a false statement as to his whereabouts on the night the crime was committed. No testimony as to the time, place or circumstance of this statement

by the officer is given and, therefore, there was no basis for any finding by the jury that the defendant's silence was an admission is made clear by the charge of the court in relation thereto.   The court said:   " Now, gentlemen, then you have the testimony of the officer—and here comes a piece of testimony that is indispensable and will enable you by following it. It is a sort of a legal balustrade that leads up—not down—that leads up to the light in the upper story of reason and the floor of common sense.   The officer told you he called on this young man; that he told him that on that night he was in company with another man.   The officer in performing that duty—that very arduous and of late a very dangerous duty—went in pursuit of the man whom he said he had been with; and you remember the officer's testimony—the officer told you the man denied he was with him; he was not there at all."   The defendant's silence was not commented upon at all.   This was placed before the jury as direct testimony to the effect that the defendant had made a false statement in relation to where he was upon the night of the robbery.   No exception was taken to the admission of this testimony or the charge in relation thereto.

During the course of the cross-examination of Cohen, one of the men alleged to have been robbed, this question was asked: " Is there anything peculiar about his walk?"   The witness answered, " No, sir," and the court interposed and said, " You are talking too much altogether—you are too prone to answering questions declaring things that are not asked of you.   Is that the man who came in and held you up [indicating defendant] ?   A. That is the man that came in—the third man.   Q. [By the Court] Is that the man [indicating the defendant] ? That is him.   Mr. Leibowitz—The mere fact he says so does not make it so.   The Court—Well, you prove that he is not— that is all."   There might have been a time when the witness should have been reproved for his loquacity, but certainly not here.   His answer was as brief as possible and clearly to the

point. The answer, however, did tend to weaken his previous testimony that he recognized the defendant by his walk. This was a most inopportune time for the court to intervene. The examination was perhaps, in the eyes of the jury, throwing some doubt upon the witness' identification and perhaps, if left alone, the examining counsel might have extracted some admission from the witness that he was not absolutely positive as to the identification. The court's admonition and questions amounted to a command not to state any extraneous facts and not to deviate from the story already told. This was emphasized by the court's statement immediately following, from which the jury might infer that this was an established fact in the case unless disproved and that the burden of disproving it was upon the defendant. This was clearly an erroneous statement of the law. The burden was not upon the defendant to disprove this or any other fact in the case. The burden was upon the People to establish every element essential to the case of the prosecution. This statement by the court might be disregarded if somewhere during the charge proper instruction had been given to the jury upon the question of the burden of proof, but that subject is not referred to in any manner in the charge. To this there was no exception.

Later I intend to take up the charge of the court and discuss some parts of it which I consider generally erroneous. I wish now, however, to call attention to a portion of the charge which I consider erroneous in view of the testimony. Three men were engaged in the commission of this crime. The first man who came into the store that was the scene of the crime wore a green cap, the second a gray cap and the third man, who it is claimed was the defendant, a brown suit and a straw hat, described by some of the witnesses as a stiff straw hat. The officer who arrested the defendant testified that the defendant told him that he had a brown suit and that it was at a tailor's; that he had worn the suit a couple of days but that it belonged to a man named Manbie. He conducted the officer to the

tailor shop but the defendant had no brown suit there and then he said Manzie had been buried in the brown suit and that he misunderstood the officer. There is no testimony that the defendant said he was wearing a brown suit on the day of this crime. The court charged the jury: " The officer asked him what clothing he had on on the night of the robbery; he described the way he was garbed—in a brown suit and a green cap. You remember the testimony of Cohen and the testimony of Rivlin. They told you that the man who held the gun and took the money out of his pocket had a brown suit and a green cap on. Do you remember, when the brown suit could not be found in the tailor shop, what the defendant told the officer? ' That a certain man had been buried in the brown suit.' " There is very little that is correct in this statement. The officer did not ask the defendant how he was dressed on the night of this robbery. The officer asked him about his clothing but not as to the clothes he wore on the twenty-fourth of June. As stated above, Rivlin and Cohen both say the defendant wore a brown suit and straw hat, no one testified that he wore a green cap, and Rivlin also says he is not sure defendant went through his pocket. This portion of the charge was excepted to and the court refused to correct it.

The charge as a whole was not the calm, unbiased review of the facts to which the defendant was entitled, nor did it contain a clear, concise statement of the law applicable thereto. It was altogether too oratorical and fervid, too much inclined to appeal to sentiment and not enough to reason for the charge of a court in a serious criminal case. It may be that in the mass of verbiage and irrelevant matters contained in it can be found nearly all those general principles as to which a jury should be instructed, but as a whole I think the charge is improper and prejudicial to the defendant. Let me contrast what the court in his charge said of the lawyers representing the prosecution and the defense. Of the assistant district attorney he said at the beginning of his charge: " Of course, I need

not tell you the representative of the district attorney's office,
Mr. Richardson—one of the big men of our jurisprudence and
one of the great lawyers of our times, exercised all of his pow-
ers in this case." And later in his charge we find this: "Now,
gentlemen, the People of the State of New York through the
office of the district attorney—one of the great law offices of the
world—the greatest law office in the world to-night is on the
other shore, in the city of New York; I had the honor of being
a member of that office—the greatest law office in the world—
the corporation counsel of the city of New York; next is the
district attorney's. The district attorney's office in this county
is an office that watches over the crimes and shortcomings and
misdemeanors of the members of society. There is no man in
that office, with one exception, whose word I would not take
for anything. The district attorney has no ambition to con-
vict any man unless he is guilty. This is the last man in the
world who would ask for any man's conviction unless in his
heart he believed he was guilty." This undoubtedly followed
an address by the assistant district attorney, who was the sub-
ject of this encomium, asking for the defendant's conviction.
So following this we have the solemn assurance of the court,
who has just informed the jury that he is a priest at the altar
of justice, "which is the most sacred altar ever erected to
God; it is the altar where liberty, and love, and light, and hope,
prosperity and peace are preached, inculcated, promulgated and
homologated," that the word of any one in the district attor-
ney's office may be relied on; that he has no ambition to con-
vict any one unless he is guilty, and that the assistant district
attorney trying this case would not ask a conviction unless con-
vinced of the defendant's guilt. Short of a direction to convict,
I cannot imagine any appeal more likely to procure a convic-
tion. It was tantamount to saying: "I, priest at this altar
of justice, assure you that the request of the district attorney
for the defendant's conviction may be safely granted." The
proper attitude of the court would have been to instruct the

jury that the opinion of the assistant district attorney as to the guilt of the defendant should be disregarded and that, if in the course of his summing up he had asserted his personal opinion, it was the duty of the jury to disregard that opinion entirely, and that it was highly improper for the assistant district attorney to make any statement to the jury in relation thereto.

Now let us see how the attorney for the defendant fared at the hands of the court. At the outset of his charge he said of him: "You have seen here with what energy and ability the young gentleman representing the defendant exercised in his behalf—a very earnest, energetic and belligerent defense." Later, in commenting on the testimony of the witness Cohen the court said: "You will have to take into consideration the dreadful examination under which he went—a most excruciating examination—a most searching examination, pro and con, which the attorney had a perfect right to do—and I am always pleased to see an attorney vigorously, even savagely and viciously, defend his client." The next comment on the defendant's attorney is found in the court's charge in relation to the unsworn testimony of a small boy who was working in the store on the night in question. This comment is found at the end of this quotation: "Now comes the testimony of the child—the statement of the child—he was not sworn—not yet twelve years of age; a child reared in poverty, obscurity and negligence; a child like millions and billions on the earth, unfortunately, whose parental care is very abbreviated—whose chances in life are dwarfed and crippled—not by the opportunities of the land but by the negligence of those who have him in charge. Every parent has not the ambition in inculcate the principles of morality; every parent has not the time, or do not seem to take the time, to tell their children of the ten commandments—the old Decalogue upon which the moral structure of life and peace, and happiness, and hope, and order is built. But he came here just as you saw him—in the rough,

a poor little scrap of human clay; timid, embarrassed and confused; no tenderness could make him feel at home. But he told you a story, and you will remember it. He told you he saw a man there with a rope under his arm; first he thought it was the defendant; you remember he told you he saw him there; but when the ingenious and skillful gentleman for the defendant came to his examination, under that masterly process of questioning another, the boy fell in and his memory gave way; he did not recall, and could not recognize the defendant." The jury was thus informed that the defendant's attorney made for him an earnest, energetic and belligerent defense, that he subjected Cohen to a most excruciating and searching cross-examination and, inferentially I think, that the attorney was savage and vicious in his defense, and then it is said of him that by his skillful and masterly examination of a " poor little scrap of human clay; timid, embarrassed and confused," he caused him to fall in and his memory give way. Could there be any choice for the jury? Does not duty require them to follow the glorified district attorney rather than the man who subjects strong men to excruciating examinations and utterly destroys the memory of little boys? To these charges exceptions were duly taken and I think they constitute errors both at law and in fact. They are erroneous in law and deprived the defendant of a fair trial.

No witnesses were examined for the defense. Five witnesses were called for the prosecution. They consisted of the two partners owning the store, two boys who worked for them and the arresting officer. The court in the course of the charge made reference to each of these witnesses. Of Cohen, one of the owners, he said: " You will have to take into consideration that Cohen is a foreigner, and I am one of the few men who know how hard it is to speak one language and to think in another; you will have to take into consideration that Cohen speaks a different language more fluently, perhaps, than our own." There is nothing in the record to justify this, and when

exception is taken no explanation is made and the question of Cohen's ability to speak English is not submitted to the jury as a question of fact, but is decided by the court without apparent justification.

·The court then refers to what he terms the excruciating cross-examination and then says: "Cohen's story is in your ears; if believed it must find lodgment in your heart, where you will put it upon the scale of reason and touch the beam of common sense. * * * Was Cohen where he had a right to be the night the three entered there? He was carrying on a legitimate business. Do you believe Cohen when he tells you ———." Then follows an assertion by the court of his intention to give every man a fair trial before him, followed by the statement, " There are no two things in nature alike, neither are there two grains of sand on the mighty ocean shore alike; there are no two human beings alike." He then tells the jury that the human eye has fixed in it the law of proportion, the law of distance, the law of shape, the law of color and each and every individual that uses its sight has all these things, and continues, " Therefore, when Cohen tells you positively—and Cohen is a young man apparently—a man perhaps forty years of age—he is not like me, whose eyes are worn out from looking * * * in answer to a question of the court's * * * You recall his answer—positively identifying the defendant." The court pictures Cohen in his store being held up, asks the jury to keep this picture in their minds when they retire to the jury room, and propounds the inquiry, " Is Cohen telling the truth?" He at least made it clear that he thought so. The insidious character of this charge is obvious. The court asserted that all human beings differ in appearance, that the human eye is blessed with the ability to distinguish these differences and that Cohen had good eyes and that Cohen said this was the man. The answer to his question, " Is Cohen telling the truth?" was self-evident.

Thus the court took up and commented on each of these wit-

nesses. Of Cohen's partner he said, "a far more careful man than Cohen," and when he was asked if he recognized the defendant: "Was there any hesitation? Not a word. * * * As Nathan said to Solomon (*sic*) ' Thou are the man!' " Of the boy Frank, "the boy was there in the living flesh. ' He was there an auditor. He observed all, he saw all, he heard all, and he has told you all he observed. .* * * You remember when I asked the boy ' Look here, boy, are you sure that is the young man who came into the store?' Did he hesitate? Did he wink? Did he look one side or the other? What was his answer? ' Yes, sir, that is he.' " His comments on the other boy I have already quoted. But the learned court follows that by telling the jury that the testimony of the boy corroborates Cohen, Rivlin and the other boy because he said defendant had a rope under his arm. The testimony as to this rope is not clear, but as I understand it, one of the men had a paper covered parcel under his arm and this parcel was thrown away outside, was found, taken to the station house and found to contain a rope. However that may be, it would seem much more just to submit the question of corroboration to the jury.

In the course of his comments on the testimony of the police officer, the court said: " Now, gentlemen, these are the facts presented by the People; and it is for you to say whether or not the People are bound to be on the spot where a crime is committed with a photographic machine and a phonographic machine, that they may take down every word and picture every attitude in order to convict a man who is accused of a crime." Of the officer he said: " Now, gentlemen, had this officer an interest? What interest had this officer? What interest has any officer? They are your servants—they are the servants of the People. And, gentlemen of the jury, we might get along for a little while without the Educational Department—one of the great departments of civilization—we might get along without the Law Department for a while, we might

get along without the Street Department for a while, and the Park Department; but, gentlemen, the Police Department is as indispensable to order and peace of society as our eyes are that we may see, or our hands that we may feel, or our tongues that we may taste; they are the eyes, the feet, the hands, the ears and the senses of the People. And you have got to be fair in your judgment of their acts. They deal with the worst men on earth—the enemies of society, the enemies of order, the bandits of peace. What would you do without them—the poorest paid men in the entire municipality—the less respected and the most deserving; courageous, bold, brave, intelligently discriminating." The defendant excepted to these statements and they were not corrected or modified. The court, therefore, in the course of the charge vouched for the reliability and good faith of the assistant district attorney and gave a certificate that the testimony for the People was worthy of credence and that it could not be improved upon unless a " photographic machine and a phonographic machine, that they may take down every word and picture every attitude " were on the spot.

As liberally as I have quoted from the charge in this opinion, I have not quoted or referred to many other portions thereof which were detrimental to the defendant and erroneous. In form this was a trial by jury, but it was such only in form. The defendant was plainly deprived of the right of having the jury pass upon the intelligence, the power of observation, the character, the credibility, the memory, the interest or bias of the witnesses and the weight and credibility of the testimony given by them. Jurors are always alert to discover the impression made upon the more experienced mind of the trial judge, and the influence exerted by a forceful judge is very potent, and when although unintentionally his attitude portrays emphatic approval of one side and all connected therewith there must necessarily result an impairment of that free and unbiased verdict which under our system of jurisprudence is regarded as essential to the administration of justice. (Peo-

ple v. Becker, 210 N. Y. 274.) I have quoted at length from the testimony and the charge for the purpose of showing that the matters complained of are not mere technicalities, but that there has been a substantial infringement of the fundamental demand of our law that the defendant shall have a fair trial.

It is urged in support of this judgment that the evidence of guilt is so strong that the judgment should be affirmed notwithstanding the errors. (Code Crim. Proc., § 542.) This cannot be done, because these errors do prejudice the substantial rights of the defendant. Further than that, the testimony was not of such a character as to be necessarily convincing.

I recommend that the judgment of conviction of the County Court of Kings county be reversed and a new trial ordered.

KELLY, P. J., KELBY and YOUNG, JJ., concur; KAPPER, J., concurs in the result.

Judgment of conviction of the County Court of Kings county reversed and a new trial ordered.