THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MAURICE E. CONNOLLY and FREDERICK SEELY, Appellants.

Second Department, November 14, 1929.

*Max D. Steuer* [*Aron Steuer* and *Ben Herzberg* with him on the brief], for the appellant Connolly.

*Naphtali A. Weidberg* [*John C. Wait* and *Frederick W. Newton* with him on the brief], for the appellant Seely.

*Emory R. Buckner* [*Hamilton Ward, Attorney-General, John M. Harlan, Herman T. Stichman* and *J. Edward Lumbard, Jr.*, with him on the brief], for the respondent.

YOUNG, J. The indictment charged the defendants above mentioned and one John M. Phillips, who died after the indictment was returned and before the trial, together with other persons unknown, with the crime of conspiracy. The indictment was in three counts, but, at the end of the People's case, the trial court required the Attorney-General to elect upon which count he would rely, and the Attorney-General thereupon elected the first count.

The first count of the indictment, after setting forth the official positions of Connolly and Seely, charged that they and John M. Phillips, together with other unknown persons, had conspired to cheat and defraud the city of New York by causing it to pay large sums of money for work done and material and equipment supplied in the construction of public sewers and sewage disposal plants in the borough of Queens, in excess of the fair, reasonable and proper cost thereof. The indictment then specifies the means employed in carrying out this conspiracy. The indictment also states twenty-one overt acts committed at various times between February, 1917, and June, 1927. These overt acts refer to the actions of Phillips, Connolly and Seely regarding the letting of contracts, changing of specifications, rejection of bids, assignment of contracts and the receipt of money, tending to show that these men acted together to cheat the city.

Upon this appeal, Connolly's counsel concedes that the evidence of guilt was sufficient to raise an issue of fact, but complains that the question of conspiracy is so close that certain erroneous rulings of the court in the reception of evidence on crucial points were highly prejudicial, and that other errors, equally prejudicial, were committed in the progress of the trial. Counsel for the defendant Seely, however, asserts that the People failed to make out a *prima facie* case of conspiracy and that there was no proof to connect Seely with any conspiracy.

It was the claim of the prosecution that Phillips, through the

favor and with the consent of the defendant Connolly, secured a monopoly in selling precast pipe for the construction of sewers in the borough of Queens, and that, for eleven years immediately preceding and including the year 1927, Phillips maintained this monopoly, selling all the pipe, with slight exceptions, used in the construction of the sewers; that he charged excessive prices for this pipe and that, in the last three years alone, 1925, 1926 and 1927, this excess price amounted to over $3,000,000; that Connolly granted and executed the contracts for the construction of these sewers, knowing that, in many cases, the contract prices far exceeded the estimates of the engineers for the work; that Connolly repeatedly rejected low bids for the work when the bidders were not satisfactory to Phillips and only allowed those contractors approved of by Phillips to secure the contracts, and that he repeatedly approved of assignments of contracts favorable to Phillips and for which he (Phillips) received large sums of money; that Connolly knew as early as 1921 that it was claimed that Phillips was charging excessive prices for his pipe, and did nothing to prevent it; that Seely changed specifications in order to keep out all bidders except those who should bid for the work, specifying precast pipe which Phillips alone supplied in Queens county over a period of eleven years. The prosecution introduced evidence tending to show that, beginning in 1916, Phillips procured the specifications in Queens county which permitted the use of precast pipe. It is contended that Phillips did sell this pipe during all these years, and the appellants do not seek to justify the prices which he received for the same, nor do they dispute that Phillips received large sums of money when certain contracts were assigned from one contractor to another. Their attitude upon the trial and upon this appeal is that Phillips was likely a very bad man, Connolly himself having testified that he did not like him or his methods of doing business. The appellants, however, take the position that they had no part in Phillips' activities, received nothing from him, made no agreements with him, and did not help him to accomplish his ends. The defendant Seely did not testify. Connolly, however, took the stand and explained how the contracts were let, what was done regarding the same, and denied any conspiracy with Phillips or that he had profited therefrom.

Sixty-seven contracts for the construction of sewers were received in evidence, and the evidence submitted by the prosecution indicated that Phillips was paid for the pipe used in the execution of these contracts $5,458,010; that the fair price for this pipe was $2,008,520, and that the excess price or graft which Phillips received from these contracts was $3,449,490. It is conceded that, before

these contracts were entered into and signed by the appellant Connolly, final estimates were prepared by the borough engineers and were submitted to the borough president. In four large contracts which were awarded by Connolly in August, 1925, the evidence shows the following:

| Low bidder | Engineers' estimates | Amount of low bid |
|---|---|---|
| Muccini & Decker | $318,389 00 | $504,187 50 |
| Angelo Paino | 510,704 00 | 799,063 00 |
| Duit, Inc | 717,557 00 | 1,104,117 00 |
| Dominick Bonnacci | 477,053 00 | 663,448 50 |
| | $2,023,721 00 | $3,070,816 00 |

The total of the low bids exceeded the engineers' estimates for these four contracts by $1,047,095. According to the evidence submitted by the prosecution, Phillips' excessive profits on the pipe sold for these four jobs was $719,135.

Again, in the case of four contracts awarded by Connolly in April, 1926, the following appears:

| Low bidder | Engineers' estimates | Amount of low bid |
|---|---|---|
| Highway Imp. Co | $443,547 25 | $638,766 00 |
| Highway Imp. Co | 599,841 00 | 944,425 00 |
| Highway Imp. Co | 399,669 00 | 618,760 00 |
| Highway Imp. Co | 244,032 00 | 368,044 00 |
| | $1,687,089 25 | $2,569,995 00 |

In these four contracts, therefore, the engineers' estimates were exceeded by $882,905.75. Phillips' excessive profits for the pipe sold on these contracts amounted to approximately $884,500.

In the case of three contracts awarded in July, 1926, the evidence shows the following:

| Low bidder | Engineers' estimates | Amount of low bid |
|---|---|---|
| Riverdale Company | $119,921 90 | $233,553 00 |
| Riverdale Company | 230,914 50 | 399,089 00 |
| Riverdale Company | 204,309 00 | 377,372 00 |
| | $555,145 40 | $1,010,014 00 |

In these contracts the excess of the low bids over the engineers' estimates was $454,868.60, and Phillips' excessive profits on the pipe used was $329,636.

These figures, of course, tell their own story. They prove that Connolly was granting contracts for the construction of sewers that were far in excess of the estimates for the work made by his own engineers. But it is claimed that this does not prove that

the excess was Phillips' graft for the pipe. In this connection, however, the prosecution, in the case of forty-eight contracts, presented evidence of the prices paid for the pipe. It was shown that in these contracts, aggregating approximately $15,000,000, Phillips received for pipe $4,500,000, and that the fair price for this pipe was $1,488,000, and it was shown that the discrepancies between the engineers' estimates and the amount of the low bids closely approximated the difference between the reasonable prices shown for the pipe and the prices which Phillips charged the contractors. It is urged, however, that this is not proof that Connolly knew that Phillips was overcharging for his pipe. Upon this subject Connolly testified that, as early as 1918 or 1919, he knew that Phillips was connected with the sale of precast pipe; that he showed himself frequently at borough hall, and that it was common knowledge that Phillips was the agent for precast pipe. In 1921 there was an investigation and Phillips testified before the Meyer investigating committee that he was selling precast pipe for his own account. Connolly heard this testimony or read about it, and Connolly testified that he knew that Phillips was selling most, if not all, of the precast pipe in Queens. Following these charges, Connolly said that he made an investigation as to whether Phillips was charging too much. His testimony is not impressive. He stated that he called up the company supplying the pipe, and some man on the phone told him they were not charging more for the pipe than it would bring elsewhere. He did not know the man's name. He also testified that he asked various contractors whether Phillips was overcharging them for pipe. They told him that Phillips was not overcharging them. He got no prices from these contractors, however. He could not remember many of those he spoke to. One was Decker, Phillips' associate and engineer, and another he thought was Richardson, who was in the company which took over a large contract by assignment and which company paid Phillips $200,000 excess profit on his pipe. Connolly said he also put the matter up to his engineers, but his engineers said they could not find out what prices Phillips was charging. He then let the matter drop. On cross-examination Connolly was asked why he did not call up the contractor before he gave him a contract and demand the price he was paying for his pipe, and he said that he did not think that was customary, and, when the court questioned him upon this subject, he was at first doubtful whether he had the power to do this, but finally admitted that he could have done so. It is argued, therefore, that Connolly had knowledge that Phillips was charging too much for his pipe; that he knew that the final estimates

were hundreds of thousands of dollars less than the contract prices for the construction of sewers; that he did little or nothing to find out why these excess prices were being paid; that it was a simple matter for him to have found out, if he had wanted to, and that only one inference can be drawn from his failure to take notice of the discrepancies mentioned and find the reasons therefor. In addition to this, the prosecution contends that Connolly's conduct with regard to the rejection of bids when the same were not satisfactory to Phillips, and awarding these contracts, after readvertisement, to those favorable to Phillips, is cogent proof that the two were working together.

The same argument is advanced with reference to many assignments of these contracts which Connolly approved. For securing such assignments, Phillips undoubtedly received large sums of money. Connolly, however, testified that he always approved the assignments when presented to him, when they were regular in form and the city's interests had been protected; that he considered that he had no further duty in the matter. In addition to this, it is contended that the evidence offered by the prosecution, showing that, in 1925, 1926 and 1927 Connolly had in his possession in currency upwards of $145,000, which he used in purchasing real estate, buying mortgages, making loans and in other ways, always making payments in cash and never through his bank account, is additional proof of the conspiracy claimed to have existed at this time between him and Phillips.

This brings me to a consideration of the testimony affecting the defendant Seely.

The claim of the prosecution is that a series of events extending over eleven years shows that Connolly, Seely and Clifford B. Moore used their official positions to keep Phillips in power where he could both control and collect excessive prices for his pipe. The evidence shows that Seely was assistant engineer in charge of design of sewers. Some of his duties were to prepare the drawings and specifications. The final estimates were prepared in Seely's department and under his direction and control. Seely undoubtedly knew what the bids were and must be charged with knowledge that contracts were being continually let which were far in excess of his own final estimates. His counsel, however, contends that this argues for his innocence because, if he thought there was anything wrong in these estimates, he would not have submitted them to be passed upon by the board of estimate and the comptroller of the city because the fraud would be quickly discovered.

The prosecution argues that Seely's whole course of conduct shows that he was conspiring with Phillips and Connolly to defraud

the city. It is pointed out that, as far back as 1919, through the activities of Phillips, Seely, with the consent of Connolly, went to Detroit with the contractor O'Rourke and Decker, one of Phillips' most favored contractors, and referred to by Phillips as his engineer. This trip was planned so that tunnel blocks might be specified for the construction of one of the sewers in Linden street. O'Rourke was the inventor of these blocks. Seely, at first, apparently was not interested, but, after O'Rourke talked to Phillips, who promised to arrange so that Seely would go to Detroit with him, Seely became very much interested, and, after the trip was made, specifications were prepared for the sewer in question providing for O'Rourke's tunnel blocks. It is also claimed that the form which these specifications took was very favorable to Phillips because it provided for the use of his precast pipe in connection with the tunnel blocks. Bids were received for this work. Phillips had arranged to have Angelo Paino get this contract, but, when the bids were opened, Booth & Flinn had underbid Paino. These bids were rejected by Connolly and the job was readvertised by Connolly and finally awarded to O'Rourke. The evidence shows that O'Rourke paid Phillip $50,000 for his services in getting his tunnel blocks introduced into Queens.

Seely's actions regarding the Hammels boulevard sewer are referred to by the prosecution as showing almost conclusively that Seely was a conspirator. The bids for this sewer were opened in August, 1924, and Patrick McGovern, Inc., a well-known contracting firm, was the lowest bidder. His bid was based on monolithic construction. This bid did not please Phillips. He had planned for one Paulsen to get this work and use his pipe, and McGovern's low bid came as a surprise. Phillips had given Paulsen a very low bid for his precast pipe, twenty-five dollars a foot, while, for the same job, he had given McGovern a quotation of thirty-two and twenty-nine dollars a foot. This contract was, however, awarded to McGovern, but the record shows that no other contract after this was awarded to any one for the construction of sewers in the manner known as monolithic construction.

Now comes the transaction which is pointed to as particularly damaging to Seely. The next sewer to be built was known as the One Hundred and Fiftieth avenue sewer, and the evidence shows that, in January, 1925, Phillips telephoned the contractor Paulsen to come to his office, and, when he arrived, he found there Seely, Phillips, Zorn and Campbell or Decker, or both, in the office. Paulsen knew Seely at this time. A conversation was had in which Seely explained to Paulsen a waterproofing requirement which he had prepared for future monolithic construction, and certain notes

in connection therewith. These requirements had not been contained in previous specifications for monolithic construction, and Paulsen testified that Seely said at that time: " I have got this dolled up so that Pat McGovern won't come in and muss up any of this work again. If you can show me where you can build forty feet [of sewer] in shorter than twenty-one days you are a good one." Phillips then remarked that Seely was the fellow that could doll them up for him, and told Paulsen that he wanted him to take care of Seely and pay him $1,000, and Seely said: " Well, don't do like the Reinsch Wurl screen outfit did. They owe me five thousand dollars yet on the Rockaway pump plant." Seely then said to Phillips: " Jack, tell Paulsen about how we handled that pumping station at Rockaway, when it was up for the first letting," and Seely then mentioned the contractor's name who had been the low bidder. Of course, Seely did not deny this conversation, but Zorn and Decker testified that they were present on this occasion and never heard any such conversation as testified to by Paulsen. Paulsen then testified that he and Seely went downstairs to a drug store at 11 Jackson avenue and Seely introduced Paulsen to a man named Arthur Leahy and said: " If you want to take care of me * * *, you can leave it here with Leahy." Paulsen told Seely that he would take the matter up with his associates, but he never paid Seely anything.

Seely's counsel insists that this testimony is false, that Paulsen is unworthy of belief; but subsequent events, I think, confirm it. The change in the specifications referred to for monolithic construction consisted, *first*, in the insertion of a waterproofing membrane in the center of the lower half of the sewer; *second*, a requirement that the concrete in the lower half of the sewer should be allowed to harden seven days after it was poured in before the waterproofing fabric could be inserted, and that the concrete in the upper half of the sewer should be allowed to harden for twenty-one days before the forms could be removed. The effect of these requirements was shown to be that a forty-foot section of sewer could be built in not less than twenty-one days, whereas, according to the specifications under which McGovern built the Hammels boulevard sewer, it would require only three and one-half days. The new specifications for monolithic construction necessitated more forms, more labor and greater delay in the construction of the sewer, and so increased the burden and expense, and it was shown that this increase made monolithic construction impossible in competition with precast pipe construction, and the evidence showed that thereafter there was no sewer construction according to these new specifications. The defendant attempted to show that this water-

proofing was desirable, and called experts to support it, but it appeared that Professor Burr, one of these experts, had approved of the original plans for monolithic construction, and it is apparent that it was a question of fact for the jury whether the change in the specifications was made by Seely in good faith or for the purpose of preventing future competition between monolithic construction and precast pipe construction. If the testimony of Paulsen is true, and subsequent events seem to confirm it, it is sufficient, in my judgment, to connect Seely with the plan to assist Phillips in his evil work.

One of the principal points made by the appellants is that the judgment must be reversed because the court improperly admitted evidence that, from unidentified sources, Connol y received moneys in excess of his salary; that it was highly prejudicial error to admit the evidence of said defendant's receipts and expenditures. Upon the trial the prosecution introduced the records of the defendant Connolly's bank account from 1917 to 1929, and also evidence showing that the defendant Connolly, in the years 1925, 1926 and 1927, had in his possession and disbursed in currency upwards of $145,000 in purchasing real estate, buying mortgages, making loans and paying his architect in connection with the new home he was building. These payments were made to fourteen different persons in twenty-three different transactions and were always in cash. None of this money was deposited in or checked out of the bank accounts of Connolly or his wife. It was also shown that, during this period, Connolly and his wife, individually or jointly, maintained four separate safe deposit boxes at different banks.

When the defendant Connolly took the stand, he failed to explain in any way his possession and expenditure of these moneys. He was not asked by his counsel to do so. He did, however, deny that he had ever received a cent from Phillips or conspired to cheat the city. The three years during which Connolly was using this cash in the manner stated covered the same period during which the Phillips pipe monopoly was at its height. The most expensive sewers were being built, and, during these three years, Phillips received over $3,000,000 in excessive pipe prices.

It is the contention of the appellant Connolly that this evidence was improperly received because there was no evidence, direct or indirect, that this money came from Phillips, and so there was nothing to identify it with proceeds from sewer construction; that the evidence was not admissible as evidence of sudden enrichment such as is admitted in cases of embezzlement, because there was no evidence of what Connolly's financial condition was prior to the period mentioned; that the possession of this large sum of money

by Connolly signifies nothing, unless it is shown that he did not have that amount before, because, without such proof, the evidence cannot possibly establish that the defendant was enriched by the acts charged that the indispensable foundation and basis of comparison is the defendant's former means, and that, without proof of this, the evidence in question was improperly received and necessarily was prejudicial and calls for a reversal of the judgment.

The principal case cited to uphold this contention is *Williams* v. *United States* (168 U. S. 382). In that case Williams, an inspector of immigration, was charged with extorting money from Chinese immigrants. The government introduced an affidavit made by Williams in another cause in which he stated that during the period covered by the indictment he had received and deposited in certain named banks substantial amounts in excess of his salary. The sources were not specified. The government followed this proof by the introduct on of his bank accounts showing those deposits. The defendant took the stand and offered no explanation for his possession of these very considerable sums, and the court instructed the jury that it might place whatever inference it saw fit upon the defendant's failure to explain their possession. The government had contended that the defendant had engaged in a general practice of extortion. The court held in substance (Mr. Justice HARLAN writing the opinion) that the affidavit and bank books were not admissible in evidence; that this evidence, at most, tended to show possession at different times of sums that were deposited in the bank to his credit and that of his wife; that no sum deposited corresponded in amount with the sums which he was charged with extorting; that there was no necessary connection between those deposits and the specific charges against defendant; that defendant was entitled to stand upon the presumption of his innocence and was under no obligation to explain what had no necessary or natural connection with the offense imputed to him, and that the court erred, under the circumstances disclosed, in not excluding th's evidence as well as in charging the jury in effect that the failure of the accused to explain how he came by these sums was a circumstance tending to show that, if given, such explanation would have operated to his prejudice in meeting the particular charges against him of extorting at one time $100 and at another $85 under color of his office.

Replying to this point, the Attorney-General insists that this testimony was competent on two grounds, first, to show consciousness of guilt on the part of Connolly, and, in support of this contention, it is pointed out that the expenditure in currency by Con-

nolly under the circumstances, where in the ordinary course of business the possession of these moneys would have been reflected in his bank account, and where checks, not currency, would have been used, brings this case within the principle laid down by the cases on this subject, citing *Greenfield* v. *People* (85 N. Y. 75); *People* v. *Place* (157 id. 584); *Lindsay* v. *People* (63 id. 143); *People* v. *Schooley* (149 id. 99).

In the *Greenfield* case the court said: " The acts and conduct of a party at or about the time when he is charged to have committed a crime, are always received as evidence of a guilty mind, and while in weighing such evidence ordinary caution is required, such inferences are to be drawn from them as experience indicates is warranted."

This fairly states the rule. None of these cases, however, is similar to the case at bar as to the facts.

The prosecution also contends that the reception of the testimony is justified under the rule which admits evidence of a recent increase in the wealth of a defendant, at or about the time of the crime charged, as a circumstance which the jury may take into consideration, together with the other evidence, in determining the defendant's connection with the offense charged in the indictment, and it is asserted that, under the decisions upon this point, the fact of Connolly's possession of this money ($145,000) in excess of his salary as borough president, and in excess of all his bank deposits, is sufficient to warrant its reception in evidence, citing *Gordon* v. *People* (33 N. Y. 501); *People* v. *Gaffey* (182 id. 257); *Commonwealth* v. *Mulrey* (170 Mass. 103); *Commonwealth* v. *Coyne* (228 id. 269).

It is stated by the prosecution that counsel for Connolly is wrong in asserting that there was a failure to show Connolly's financial position prior to his possession of the $145,000, and the evidence is referred to, showing that Connolly had been borough president continuously from October 4, 1911, to April 2, 1928; that his salary down to 1921 was $5,000 a year, then for three years $10,000, and from June 1, 1923, $15,000 per year; that transcripts of his bank account showed that he deposited his salary plus some additional amounts, not very substantial; that many checks were drawn against this account, small in amount, averaging for the whole period $59.82; that any possibility that Connolly may have made money from outside investments originating from his bank accounts was clearly negatived by the number and amounts of his withdrawals, as well as by the fact that had this $145,000 had its source in such investments, it would naturally have appeared in his bank deposits, and it is argued that this evidence constitutes a sufficient foundation as to prior financial condition to authorize the reception of

evidence of Connolly's possession of the $145,000, which he disbursed in cash.

It is asserted by the prosecution that the case of *People* v. *Gaffey* (*supra*) is precise authority for the sufficiency of the foundation laid in the present case for the introduction of this evidence. In the *Gaffey* case the defendant was convicted of forging a note which had been discounted by the defendant at a bank and the proceeds credited to the account of defendant's employer. Evidence was received that the defendant at various times during the preceding three years had similarly discounted forged notes and had placed the proceeds thereof to the credit of his employer. In order to show the motive of the defendant for the forgery in July, 1903, with which he was charged, the People introduced in evidence the passbooks of the defendant at three savings banks, showing the deposits by the defendant, over the period of three years during which he was discounting the forged notes, of various sums of money. It was the People's theory that these deposits represented moneys stolen or embezzled by the defendant from his employer, and that the motive of the defendant in forging the notes, discounting them, and crediting the proceeds to his employer's account was to cover up his stealing or embezzlement. The only foundation laid for the introduction into evidence of the defendant's savings account passbooks was that during the period in question the defendant's salary from his employer was at the most twelve dollars per week, and that the defendant had a wife and family to support. The sums deposited by the defendant in his savings accounts exceeded the amount of his salary. Although one of the People's witnesses had testified to having seen the defendant on several occasions taking cash from his employer's cash drawer, no evidence was introduced as to the amounts so taken by the defendant, and no effort was made to relate the amounts so taken to the amounts of any of the deposits made in his savings accounts by the defendant. The extent of the foundation laid by the People is clearly shown by the following quotation from the opinion of the Appellate Division which reversed the judgment of conviction (*People* v. *Gaffey*, 98 App. Div. 461, at p. 463): " It is not contended that the avails of the note in question or of any of the notes of similar character were included in the money so deposited by the defendant. Nor is there any evidence to indicate that the money so deposited was not the money of the defendant and obtained by him in a perfectly legitimate manner. There is no item of evidence from which the inference could be drawn that the defendant was not a man of property and entirely able to make the deposit shown from his earnings or other sources of revenue, unless such inference may be

drawn from the fact that he was working for Soper in the capacity in which he was for the compensation of twelve dollars per week. Whether during the time he was receiving money from his wife, relatives or friends or from investments made by him, in no manner appears."

Although the Appellate Division placed its decision reversing the judgment of conviction in that case on the ground that the evidence as to the defendant's stealings from his employer was inadmissible for the reason that it showed the commission by the defendant of another crime for which he was not being tried, the above quotation shows that the court regarded the foundation for the evidence as inadequate. The case then went to the Court of Appeals. In reversing the Appellate Division and in affirming the judgment of conviction, the Court of Appeals said (182 N. Y. at p. 261): " Hence, it was open to the public prosecutor to prove such a motive if he could. What he claimed was that the deposits in the savings banks represented money that the defendant abstracted from the cash drawer of the grocery concern and the spurious notes were made and discounted at the bank in order to keep up the credit of the concern and cover the loss of cash which was, as claimed, almost a daily occurrence for months and years. Proof of this character would tend to explain the conduct of the defendant in depositing a series of spurious notes to the credit of his employer and tend to show the real  motive and reason for the defendant's conduct which, without such proof, might cause the jury to hesitate before finding that he had forged notes without any purpose or motive of benefit to himself. The fact that the defendant had a private account, not only in one savings bank but in three, and made such frequent deposits in all of them, was a remarkable circumstance when we consider that his earnings were at most but $12 per week and that he had a family to support. The question naturally suggests itself where did he get the money to make these deposits?

" The defendant went on the stand and attempted to give some explanation of the circumstances, but he did not throw much light on them. He testified that about fifteen years before he received $3,500 as the result of the purchase by him of a lottery ticket; that about the same time he won a couple of thousand dollars by betting on election. He owned the house where he lived and a couple of vacant lots and held a note against his employer of $2,100. All his property did not exceed $7,000, and the note was the only part of it that could produce any income and that was very small. The constant deposits of money in the savings banks were not explained or accounted for. The question was not whether the proof given

was sufficient to convict him of larceny by embezzlement, but whether the facts were not such as to permit the jury to draw an inference as to motive in procuring the spurious notes to be credited to his employer.  *  *  *

"We think, therefore, that the evidence which the bank passbooks contained was competent on the question of motive. It tended to explain what otherwise would remain obscure since it furnished the key to the defendant's conduct in apparently committing forgeries that could not benefit himself."

The prosecution argues that, in the present case, there was more justification for the introduction of this evidence than appeared in the *Gaffey* case, and it is pointed out that, in the *Gaffey* case, the People were allowed, on the question of motive, to prove transactions running over a period of three years preceding the crime charged, while, in the present case, the evidence was limited to the possession by Connolly of this money at the very peak of the alleged continuing crime charged in the indictment, and that in the *Gaffey* case the defendant took the stand and attempted to explain the source of his deposits.

The prosecution also cited the case of *Commonwealth* v. *Mulrey* (170 Mass. 103). In that case a city clerk had been indicted together with another defendant whose business was hiring out teams to the city, for obtaining money by false pretenses. The substance of the prosecution's case was that the defendant city clerk, whose duty it was to make returns to the city of teams which had been hired, falsely represented in such returns that the other defendant was entitled to compensation for teams ostensibly hired to the city, but which in fact had not been so hired. Evidence of deposits by the defendant city clerk in excess of his official salary was admitted, and in approving the reception of such evidence Mr. Justice HOLMES said: "Exceptions were taken to the admission of evidence of deposits of money by Mulrey, between the dates of the first and last payments made to Finneran, of an amount much too large to be accounted for by his salary which was twelve hundred dollars a year. The evidence by itself of course did not prove criminal conduct. But it is not necessary that every piece of evidence admitted should be sufficient by itself to prove the crime. Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusions which would be drawn from the other facts. *Commonwealth* v. *O'Neal,* 169 Mass. 394. It is possible that Mulrey may have had an independent fortune from which his deposits came, but that was open to him to prove if he saw fit, and was not the probability with regard to one who was working

in his place and for his pay. The evidence properly was admitted, in connection with independent evidence tending to show a successful fraudulent conspiracy between Mulrey and Finneran."

In *Commonwealth* v. *Coyne* (228 Mass. 269) two defendants were convicted of the larceny of certain articles of jewelry and precious stones of an aggregate value of about $5,000. After the defendants had introduced some evidence, the court, at the request of the district attorney, permitted him to reopen the case and to introduce evidence that, upon the arrest of the defendants two months after the crime, one of the defendants had in his possession $350 in money and jewelry worth about $1,600, and that the other had in his possession $117 in cash and jewelry worth about $600. The jewelry was not identified as part of that stolen. In upholding the admissibility of this evidence, Chief Justice RUGG said: " The possession of property of considerable value, whether jewels or money, although not identified as a part of the property stolen, is nevertheless a circumstance proper for the consideration of the jury as tending to show property in the hands of the defendants subsequent to the alleged larceny. , Such evidence is competent in the case at bar. Its weight may be trivial or cogent according to other conditions shown. It might be slight against a person of affluence and of extravagant habits. It might be of importance against one of small estate or of no visible means of support. There was evidence tending to show that neither of the defendants had worked for a year and that when arrested they declined to tell where they were on the date of the crime alleged."

And, in commenting upon the *Mulrey* and *Williams Cases* (*supra*), it was said: " Upon the authority of that decision [*Commonwealth* v. *Mulrey*] and of *Commonwealth* v. *Montgomery*, 11 Met. 534, this evidence was admissible. If there is anything inconsistent with this conclusion in *Williams* v. *United States*, 168 U. S. 382, 396, it is equally inconsistent with our law as declared in the authorities just cited. Indeed, the soundness of the Federal decision has been doubted. See 1 Wigmore on Evidence, § 154."

After careful study of the cases cited, and consideration of the arguments of counsel, I conclude that the evidence in question was properly received.

Another assignment of error by the appellants is that the trial court erred in admitting against the defendants evidence that Clifford B. Moore, consulting engineer, who was not on trial, had deposited in his bank account in cash during 1925, 1926 and 1927, a large amount of money in excess of his salary, approximately $58,000. Moore was not named as a defendant in this indictment. It is argued, in the first place, that there is no evidence connecting

Moore's deposits with Phillips or with any contractor; that the evidence fails to show the source of this money so deposited, and it is stated that every contention urged against the admissibility of the proof of the defendant Connolly's bank account and payments applies to the proof of Moore's account, and it is urged that in the absence of any evidence of knowledge on Connolly's part, this evidence was not admissible against Connolly unless the prosecution established that Moore, though he was not named or indicted, was a co-conspirator. Sometime, either before or after introducing the evidence, the prosecution had to lay a foundation for it by showing Moore's complicity in the conspiracy charged.

It is then asserted that the evidence is not sufficient to show Moore's complicity in this conspiracy. The prosecution answers this contention by stating that the evidence is amply sufficient to show that Moore was a co-conspirator with the others. The evidence relied upon by the prosecution to show this connection is referred to.

It appears that Moore was appointed an assistant engineer in Queens county on November 1, 1904, at a salary of $1,650 per year. In April, 1915, he had been promoted and received a salary of $6,000. Connolly then took him out of the civil service classification and appointed him consulting engineer and he was acting in this capacity during the years 1925, 1926 and 1927, at a salary of $7,500 and $8,000 per year. To show Moore's part in the alleged conspiracy, reference is made to Moore's written approval of certain bids upon which Connolly awarded contracts. The record shows at least eight instances where this was done by Moore, and in these cases gross disparities between the bids and final estimates appeared. In addition to this, it was shown that Moore advised the rejection of certain bids which the evidence indicated was done in the interest of Phillips, to which I have already referred.

This evidence, in my opinion, is sufficient as *prima facie* proof to warrant the admission of Moore's financial transactions. It must be remembered that Moore was the engineer who approved the bids. Connolly signed the contracts upon Moore's recommendation and this recommendation was at times indorsed on the bids. Moore had been long connected with the sewer department. He was familiar with the estimates of the borough engineers for the work, and the fact that he saw that these contracts far exceeded the estimates is strong evidence to my mind that he knew that the contracts were dishonest. This being so, I think the other evidence referred to is sufficient to show that he did what he did do in recommending the rejection of one contract and the approval of another, each time in the interests of Phillips, in furtherance of

the conspiracy. If I am right in this conclusion, then the evidence concerning his bank accounts was competent as an act of a co-conspirator.

The defendant Connolly contends in this connection that the trial court erroneously withdrew the question whether Moore was a co-conspirator from the jury, and permitted them to consider the evidence against him without regard to whether a conspiracy existed between him and Connolly. This point is predicated upon the seventh request to charge, which is as follows:

" 7. There has been read to you entries from the bank account of Clifford B. Moore. Unless, independently of that evidence, you would be willing to convict him of the conspiracy charged, you must dismiss that evidence from your minds. It would not only be wrong and unjust to the defendants, but it would outrage the law for you to consider that evidence at all unless you first concluded from the other evidence that beyond a reasonable doubt Clifford B. Moore was guilty of the conspiracy charged, although he was not indicted for it. So, before you give that evidence any thought, I charge you to first ask yourselves, ' On the other evidence before us, can we say he is guilty? ' "

The trial court declined to charge this request, and an exception was taken. Connolly's counsel asserts that this was error for which the judgment of conviction must be reversed.

Assuming for a moment that Connol y was entitled to a charge as stated in the brief of his counsel, that before the jury " could consider Moore's bank records as evidence against Connolly, they must first conclude from the other evidence that a conspiracy existed between Moore and Connolly," it is to be noted that this is not the language of the request actually submitted, and, in my opinion, the trial court was not required to adopt the violent language, and charge this request in the form submitted. It went much further than a simple statement of the law contended for by counsel. Thus, the court was not obliged to charge that unless, independently of the evidence in question, the jury would be willing to " convict him [Moore] of the conspiracy charged," they must dismiss that evidence from their minds; nor that their consideration of that evidence would " outrage the law " unless they first concluded that beyond a reasonable doubt Moore was *guilty* of the conspiracy charged, although not indicted for it; nor that, before they gave that evidence any thought, they must first ask themselves " On the other evidence before us, can we say he is *guilty?* "

This request was carefully framed so as to embody, if stripped to its essentials, the principle of law which counsel believed applicable, and at the same time with the purpose that, if charged, it would

tend to alarm the jury and mislead them into the belief that if they found Moore to be a party to the conspiracy they would be convicting him and finding him guilty of a crime for which he had not been indicted and was not on trial, and that such a conviction would " outrage the law," etc.

But I think the request was properly refused for another reason. In *People* v. *Davis* (56 N. Y. 95) the Court of Appeals said in this connection: " The general rule is, that when sufficient proof of a conspiracy has been given to establish the fact *prima facie* in the opinion of the judge, the acts and declarations of each conspirator in the furtherance of the common object are competent evidence against all."

When this rule is complied with and the proof is sufficient to establish the fact *prima facie* in the opinion of the judge that a conspiracy exists, then the acts and declarations of each conspirator in the furtherance of the common object are competent against all. I have already pointed out the evidence which to my mind is sufficient as *prima facie* proof of the conspiracy between Moore, Connolly, Phillips and Seely. This being so, the evidence of Moore's financial transactions was properly received in evidence if Connolly's like transactions were competent. It is not the rule that the jury may not consider such evidence against Connolly unless they first decide that Moore was a conspirator beyond a reasonable doubt. Such evidence may be considered after *prima facie* proof of the conspiracy is given, and then the jury, after considering all the evidence including this evidence of Moore's personal transactions, now properly received in evidence, must dec'de whether the conspiracy has been made out beyond a reasonable doubt before conviction may be had. In this view, the request to charge was plainly wrong because the court was asked to charge the jury that they could not consider the evidence of Moore's financial transactions unless they first concluded from the other evidence that beyond a reasonable doubt Moore was guilty of the conspiracy charged.

Another specification of error made by the appellants is that the court denied the defendants the full number of peremptory challenges to which the statute entitled them. It is beyond question that, pursuant to sections 360 and 373 of the Code of Criminal Procedure, the defendants, being tried together, were entitled jointly to five peremptory challenges.

Section 360 provides that " when several defendants are tried together they cannot sever their challenges, but must join therein."

In *People* v. *Doran* (246 N. Y. 409, 425) the Court of Appeals construed this statute to mean that the defendants must unite in

their challenges; that, if each defendant could exercise a challenge independently of the other, there would be no such thing as joining in a challenge.

A reading of the record shows plainly that counsel for the defendants thought each defendant was entitled to five peremptory challenges. This appears during the examination of the talesman Russell. The court here announced that the defendants together were entitled to only five peremptory challenges, and not each entitled to five. Counsel for Seely stated, " I thought we were each entitled to five." The court ruled to the contrary and counsel for Connolly said, " We respectfully except to that ruling." The trial justice apparently proceeded on the theory that a peremptory challenge made by one defendant was to be regarded as a joint challenge unless the other defendant dissented or objected. The only suggestion of a dissent was made by counsel for Connolly when the fifth peremptory challenge interposed by him was allowed in the case of the talesman Ruff, at which time the court announced as follows:

" The Court: The juror is challenged peremptorily by the defendants. That is your fifth peremptory challenge.

" Mr. Steuer: I do not so regard it, your Honor.

" The Court: That is my ruling.

" Mr. Steuer: I certainly have not joined in five challenges, even.

" The Court: No, but the defendants together have.

" Mr. Steuer: I respectfully except, your Honor."

It is to be observed that four of these five peremptory challenges were interposed by counsel for Connolly, and the other one of the five challenges interposed by counsel for Seely was not objected to by counsel for Connolly. He merely took an exception to the ruling of the court that the defendants were entitled to only five peremptory challenges jointly. It seems to me that the remark of counsel that he had not joined in five challenges was made in defense of his contention of the right of each defendant to exercise five peremptory challenges. Upon this appeal, however, it is vigorously asserted by the appellant Connolly that a joint challenge by two or more defendants can be evidenced only by express concurrence on the part of the defendant or defendants who have not initiated the challenge. It is now asserted that none of the five challenges was a joint challenge, as required by the statute, because of the absence of express concurrence. Connolly's position is that, after the court had excused the five jurors, four of which he challenged, he was still entitled to participate in one more challenge, which the court refused, and, if this is true, of course Seely would be entitled to participate in four more peremptory

challenges, he having excused but one of the first five. The record shows that, after the fifth peremptory challenge had been allowed, two other talesmen were challenged peremptorily, one by Seely and one by Connolly, but in neither of these two cases was there an express joinder in making the challenge. Both these challenges were denied by the court and the jurors sworn.

The prosecution presents several arguments to meet the objection here raised. Both counsel agree that, under the ruling of the decision in the *Doran* case, unless the defendants join in making a peremptory challenge the court should not recognize the challenge and the juror should be sworn, unless excused for other reasons. But the prosecution argues, in the first place, that the Court of Appeals has not stated the means by which a joinder in a peremptory challenge is to be evidenced. It may be done by express concurrence, or, on the other hand, it may be shown by conduct of counsel, and that acquiescence on the part of one defendant when a challenge is interposed by the other may be taken by the court as a joinder by the defendants; that it is not the duty of the court to call the roll of the defendants in each case to ascertain whether there is a joinder, but that, if a challenge is made by one defendant and acquiesced in by the other, the court may consider it a joinder, and it is argued that this is what occurred in the case at bar; that counsel for Connolly himself peremptorily challenged four of the first five talesmen and acquiesced in the one challenged by counsel for Seely and that he acquiesced in the four challenged by counsel for Connolly. In view of the contention of counsel at the time that they were each entitled to five peremptory challenges, and excepted to the ruling of the court to the contrary, it seems to me that there is considerable force in this argument. They were willing enough to acquiesce in the challenges made, but they objected to the ruling which deprived them both of five peremptory challenges.

However, I am of the opinion that, even if the appellants are right in their contention, and if express concurrence is necessary to constitute a joint challenge, there was no error committed by the trial court in disallowing the two challenges made after the five challenges were exercised, because the defendants failed in both these cases to expressly concur in the challenges made. That they did not do so is cogent proof, to my mind, that they were not contending that express concurrence was necessary. Shrewd counsel surely would have made a record in respect to these two challenges which would clearly show express concurrence, but they failed to do so. Each counsel challenged one of these two jurors. There was no joint challenge. The record in this respect satisfies me that counsel, in challenging peremptorily these two talesmen,

were making a record to protect their contention that each defendant was entitled to five separate challenges. It is undoubtedly the law that no error can be assigned in connection with the exercise of peremptory challenges unless the trial proceeds with a juror in the box who has been properly challenged by the defendant assigning the error. No objection, of course, is made by the defendants to the action of the court in excusing the first five challenged peremptorily. There is error in this respect only if it appears that the trial court erred in not excusing the last two talesmen mentioned who were peremptorily challenged and the challenges overruled by the court, and who served as jurors. The record shows, however, that no joint challenge was interposed in either of these instances, and this being so, and the appellants contending that such joint challenge was necessary, the court was clearly right in overruling both these challenges.

The appellants also claim that the remarks of the prosecutor in his summation concerning character evidence and character witnesses were improper and prejudicial and call for a reversal of the judgment. The statement criticised is as follows:

" Then the defense called character witnesses, very reputable and high-class men. Those of you who have sat in criminal trials before are familiar with character witnesses, and as you heard the men, very proper evidence indeed. In criminal cases there are always character witnesses, except for a taxicab bandit or a burglar. There are always character witnesses for anybody who has been a respectable person. The evidence is always admitted to show whether or not up to the time of this charge or this trouble the defendant bore a good reputation. Mr. Steuer is right when he says he could be calling them for a year. Of course he could. How could Mr. Connolly have been re-elected, how could he have been re-elected in 1917 and 1921 and 1925 if his reputation was not that of an honest and upright public official, and that the charges that were bruited around in 1925 were false? Why, they could have called every single voter who voted for Mr. Connolly and he would have testified to that, of course. But you will hear the court's charge, the charge that is always given in every case where there is character evidence, always given, that character evidence is proper and should be considered by you, and in fact may even raise a reasonable doubt in certain cases under all the circumstances where without it there would be no reasonable doubt. I know it by heart. I have heard it given so many thousands of times. Now, this is what I have to say about those gentlemen. Those gentlemen are all so high-class — of course Mr. Connolly had a splendid reputation in those circles where he met Judge

Humphrey and Father Meehan and Dr. McGill. Of course there is no difficulty at all for them to testify that his reputation among the people he associated with was excellent before these trials. No difficulty at all. But if Judge Humphrey, Father Meehan, Dr. McGill, that school principal and that life insurance agent, if they were jurors, if they took oath as jurors and heard all the evidence that you have heard in three weeks, every single one of those men would vote for the conviction of Connolly, and I will stake my professional reputation on it.

" Mr. Steuer: Well now, Mr. Buckner said that he would stake his professional reputation on the statement that every one of those witnesses would have voted for Mr. Connolly's conviction. I never heard a statement more outrageous, more unjustified, or more improper, and I ask your Honor now, not merely to admonish, but in view of that statement to withdraw a juror.

" The Court: No, I deny your motion.

" Mr. Steuer: And I except. And your Honor does not even admonish him?

" The Court: I do not think there is any impropriety in the suggestion.

" Mr. Steuer: That these men would have voted for conviction?

" The Court: I will not hear any argument, Mr. Steuer.

" Mr. Steuer: And I respectfully except.

" The Court: Proceed, Mr. Buckner."

The appellants contend that this statement, to the effect that he would stake his professional reputation that the character witnesses would vote for the conviction of Connolly had they been sworn as jurors and heard all the evidence in the case, destroyed the value of the evidence of defendant's good reputation and character and was highly objectionable and prejudicial, particularly as the trial court placed upon it the seal of approval. Reference is made to *People* v. *Conrow* (200 N. Y. 356) and *People* v. *Colantone* (243 id. 134), where the Court of Appeals pointed out that evidence of good reputation and character is as much evidence as any other, and that any instruction or ruling that belittles such evidence may be cause for reversal.

In the *Colantone* case Judge CRANE said: " This court has frequently stated that evidence of good character is a matter of substance; not of form, in criminal cases, and must be considered by the jury as bearing upon the issue of guilt, even when the evidence against the defendant may be very convincing."

Cases are also cited which hold that it is improper in a criminal case for the district attorney to express his opinion as to the guilt of a defendant on trial.

The answer to this contention is that, in what was said, the

prosecutor did not express his opinion as to the guilt of the defendants; that it is one thing for a prosecuting officer to state baldly to the jury his opinion that a defendant is guilty, which opinion may or may not be based on the evidence in the case, but quite a different thing for a prosecuting officer to state to the jury that, in his opinion, the evidence in the case is sufficient to call for a conviction; that, if a prosecuting officer does not believe this, he should not prosecute the case, and that it is an everyday occurrence for a district attorney to call upon the jury to convict a defendant upon the evidence submitted and it is not improper for a district attorney to say that, in his opinion, the evidence warrants a conviction.

It is also argued that these remarks, in any event, were not prejudicial because of the court's charge on the subject. The court said: " Now, gentlemen, the arguments of counsel and the statements of counsel are not to influence your judgment unless they are reasonably justified by the facts; in other words, unless they are fair comment upon the evidence or the credibility of the witnesses." The court also charged: " The defendant has produced witnesses who testified to his good reputation, called character evidence, and that evidence is to be considered by you gentlemen on the question of the defendant's guilt or innocence. These witnesses have testified that his reputation has been good, and that sort of evidence is received and considered by a jury in a criminal case on the theory that a man who has always borne a good name, lived an upright life, and had a good reputation is not likely to commit the crime with which he is charged. But if the defendant's guilt has been established beyond a reasonable doubt, then the fact that he has heretofore borne a good reputation. cannot save him from the consequences of his crime. In other words, a man cannot commit his first crime, no matter how long he has lived an upright life or how good his reputation among his neighbors has been, he cannot commit his first crime and then plead his good reputation as a defense. But on the question of whether or not the defendant has committed the crime charged against him, on the question of his guilt or innocence, you are to consider the testimony given respecting his former good reputation."

In addition to this, counsel requested a charge as follows:

" Mr. Steuer: Now, the 18th request we submit —

" The Court: The 18th?

" Mr. Steuer: Yes, sir.  Our thought is that your Honor did not in that regard express the law as it should be applied.

" The Court: This amplifies what I have already stated, and I will read it to the jury.

" Mr. Steuer: All right, sir.

" The Court: The defendant Connolly has called witnesses who have testified to his good character. Evidence of good character is not opinion testimony. It is testimony of a fact. The prosecution had the right to call witnesses to contradict that testimony. Under the law, a presumption of innocence arises both from the defendant Connolly's affirmative evidence of his good character and from the prosecution's failure to attack it. Testimony of good character may, in and of itself, create a reasonable doubt, and when it does, the defendant in whose favor such doubt is created must be acquitted. In the exercise of sound judgment, the Court instructs you that you may give the defendant Connolly the benefit of his good character — it is not good character, it is good reputation, Mr. Steuer.

" Mr. Steuer: I except to the Court's modification.

" The Court: It is good reputation. There is a difference between the two. I do not, gentlemen, by making this charge modify anything that I have already said on that subject. What I have said to you on the subject of the character testimony stands, and it is to be considered by you on the question of the defendant's guilt or innocence. It may in itself create a reasonable doubt but if no reasonable doubt exists and the defendant's guilt is established beyond a reasonable doubt, then the evidence of good character cannot save them from the consequences of their crime."

Counsel for appellants insist, however, that the plain implication from the argument was that, if the defendant Connolly's character witnesses knew the evidence, they could not and would not have taken the stand in his behalf, and that this destroyed the value of the character evidence; that the prosecutor wanted the jury to believe that, if they were satisfied of the defendant's guilt from the other evidence in the case, they need pay no attention to the evidence of good character because the character witnesses themselves would have convicted Connolly upon the evidence in the case. I am satisfied that the statement here complained of is not the same as the statements we find condemned by appellate courts made by prosecuting officers expressing opinion as to the guilt of a defendant. Those cases, so far as I recall, and no case is cited to the contrary, dealt with bald statements of prosecuting officers expressing an opinion as to the guilt of a defendant. Such opinions may not rest upon the evidence in the case at all or only to a degree, and are plainly improper. The statement here complained of is not exactly of this sort, and while the reference to the professional reputation of the prosecutor might well have been omitted, my opinion is that the judgment should not be reversed upon this ground, particularly as the court charged fully and fairly upon the subject.

Other points raised by the appellants have been carefully considered, and the court is in accord that they do not present reversible error.

The judgment of conviction, and orders, should be affirmed.

SEEGER, J., concurs; LAZANSKY, P. J., concurs in separate opinion; RICH and KAPPER, JJ., dissent and vote for reversal and a new trial, each in separate opinion.

LAZANSKY, P. J. (concurring). I am in accord with the conclusion reached by Mr. Justice YOUNG on the facts as to appellant Seely. It is unnecessary to consider the facts as to appellant Connolly, as he concedes that only questions of law are involved. As to all questions of law I agree with the determinations of Mr. Justice YOUNG but differ in the reasons in several respects and deem it proper to express my views thereon.

The proof of defendant Connolly's financial transactions was admissible upon the theory of " sudden enrichment." (*People* v. *Gaffey*, 182 N. Y. 257.) But if, as urged, it was not admissible upon that basis, then it was admissible for another reason. These financial transactions were handled in an unusual, irregular and unbusinesslike manner. One advised of the circumstances would immediately inquire: Whence came this money, kept out of the ordinary channels where it would readily be disclosed? Why were these funds not deposited in bank and disbursed by way of checks? The method was open to suspicion. These questionable transactions took place during a period within which it was charged defendant Connolly committed official acts for which money gain might be a motive, and thus the inference was warranted that this money bore relationship to official acts. Of course, this inference might be countered by an explanation which would disclose an unimpeachable title. But it was for a jury to determine upon the facts, without or in light of an explanation given by the defendant, whether such inference should or should not be drawn. No such explanation was given by defendant Connolly save such as might be taken from a general denial of the receipt of moneys upon the basis claimed.

The admission of the bank account of Moore presents a more difficult proposition. Were this a matter of initial impression, I would be in doubt as to the admissibility of this proof, either upon the theory of " sudden enrichment " or because the circumstances under which the money was handled were so unusual or out of the ordinary that they justified the inference, in light of the other circumstances in the case, that they were corruptly acquired. But *People* v. *Gaffey* (*supra*) is controlling and must be followed,

although there seems to be a different view expressed in *Williams* v. *United States* (168 U. S. 382).

In considering the purpose for which this proof could be received, it must be remembered that it was a conceded rule that the People might prove that Moore, not named in the indictment, was a conspirator. As an act of an alleged conspirator in the course of the common plan, if it were such, it would not be admissible unless it had first been proved that Moore was a conspirator. While, in the opinion of Mr. Justice YOUNG, with which I am inclined to agree, it was so first proved, I rest my view that the evidence was admissible on a different basis, *i. e.*, as evidence of Moore's corrupt motive in doing certain acts which, it is claimed, were done pursuant to the conspiracy, in order to connect him with it. Here, motive may have played an important part. Official acts might be deemed innocent or the result of official neglect, or, as suggested by Mr. Justice RICH, they were as consistent with innocence as with guilt; but when it is shown that money was the impelling inducement of the acts, the balance may be turned in favor of guilt, especially where the People's case, as here, was largely built on circumstantial proof. Moore's official acts, the motive therefor, with other facts in the case, were the basis upon which the jury might have found that Moore had joined Phillips and defendant Connolly for the purpose of cheating the city. Defendant Connolly concedes that aside from legal error the conviction was warranted. This, in effect, means there was sufficient proof to show a conspiracy between defendant Connolly and Phillips. As part of the proof to connect Moore with either or both of them, it was proper to show the spirit in which he performed his official acts. The evidence bore upon Moore's relationship to the others, and was properly admissible as to him. *Cuyler* v. *McCartney* (40 N. Y. 221) is not to the contrary. In that case it was claimed that an assignment for the benefit of creditors was fraudulent, and that the assignor and assignee had conspired to that end. It was held that the admissions of the assignor were not competent to prove the conspiracy as against the assignee, since the conspiracy had not first been otherwise proved. But in that case it was stated that the admissions of the assignor were proof of his fraudulent intent as to him. In *Rutherford* v. *Schattman* (119 N. Y. 604) it was stated that until a conspiracy was *prima facie* proved, the acts and declarations of an alleged conspirator were not admissible as against others, but were against himself. But it is urged that the absence of Moore from the trial, a situation not chargeable against defendants, made it impossible to present an explanation of the state of his bank account, with the possibility that it might be demon-

strated it was not involved in corruption. The want of explanation, through no fault of defendants, would be for the jury to consider in determining whether or not to draw the inference argued for by the People. It is possible that in evaluating this proof the jury took into consideration the fact that Moore was not present to explain away the inference that might be drawn, and that the jury disregarded the proof entirely. If, during the course of this trial, a witness had testified that Phillips had given money to him to present to Moore, and that the witness had given it to Moore, or if a witness had testified that he had been told by Moore that the latter had conspired with Phillips to cheat the city, surely, upon the hypothesis that it might be proved that Moore was a conspirator, such testimony would be proper within the limitations above stated. The absence of Moore would not render it inadmissible. The fact that Moore was not present as a witness or defendant might make a difference to a jury in determining the weight to be given to the testimony. A jury might refuse to accredit the testimony in the absence of a man who might be able to refute it. There is involved here a question of quality, and not competency, of proof. Had the court been requested so to do, it might have called the attention of the jury to the absence of Moore through no omission of the defendants, and instructed the jury that it might take that fact into consideration in weighing the proof, as indicated. In light of the view of counsel for defendant Connolly that this testimony was admissible only after it had been otherwise proved that Moore was a conspirator, no such request could have been in mind. Granting the rule that such proof is inadmissible unless there be opportunity to explain, it has not been violated. There was no proof that Moore was dead, absent from the jurisdiction, or in any wise incapacitated from attending as a witness. Nor is there anything to indicate that defendants were denied a full opportunity to call him. · While a failure to submit him as a witness was not chargeable against defendants, their unhampered privilege to call him was opportunity to explain. For these reasons the testimony was admissible, and it follows that defendant Connolly was not entitled to the charge requested, even if it had been framed as outlined in the opinion of Mr. Justice YOUNG.

RICH. J. (dissenting). Upon the trial there was received in evidence over the objection and exception of the defendants, evidence of deposits by Clifford B. Moore in his bank accounts during the years 1925 to 1927 of some $83,000 in excess of his salary and of visits by himself and Mrs. Moore to their safe deposit box.

This evidence, the court told the jury, was relied upon by the prosecution in support of the charge of conspiracy and as proof of profits derived therefrom. The following request to charge was made and refused: "There has been read to you entries from the bank account of Clifford B. Moore. Unless, independently of that evidence, you would be willing to convict him of the conspiracy charged, you must dismiss that evidence from your minds. It would not only be wrong and unjust to the defendants, but it would outrage the law for you to consider that evidence at all unless you first concluded from the other evidence that beyond a reasonable doubt *Clifford B. Moore was guilty of the conspiracy charged, although he was not indicted for it.* So, before you give that evidence any thought, I charge you to first ask yourselves, ' On the other evidence before us, can we say he is guilty? ' "

The theory upon which the evidence was received was that the prosecution had established *prima facie* that Moore was a co-conspirator. The admission of this evidence required the existence of other proof *prima facie* of Moore's complicity in the conspiracy. (*People* v. *Davis*, 56 N. Y. 95.) *It was inadmissible as evidence of the conspiracy itself.* (*Cuyler* v. *McCartney*, 40 N. Y. 221, 228.) The evidence to which our attention is directed, and which it is claimed established *prima facie* Moore's complicity in the conspiracy, is his written approval of certain bids, contracts upon which were awarded by the defendant Connolly, and advice as to the rejection of certain bids upon which Connolly is claimed to have acted. This, it is said, established *prima facie* that Moore was a member of the conspiracy.

Evidence of recent accession of wealth is warranted only upon the theory that the persons against whom it is offered are in conspiracy. Its object in the case at bar was to create the inference that Phillips had bribed Moore in furtherance of the conspiracy. There is too great a void, however, between the fact of Moore's deposits and the inference sought to be drawn, to warrant the conclusion that Phillips was the cause of them. It is not disputed that Moore's duties as consulting engineer were, among other things, the approval or rejection of bids for the advice of the defendant Connolly, who was not an engineer. His approval and advice as to rejection of bids is, it seems to me, under the circumstances, as consistent with innocence as with guilt. It follows, I think, that the proof was not sufficient to establish *prima facie* that Moore was a co-conspirator. Furthermore, while the defendants were not entitled to the charge in the form requested, they were entitled to a charge that before the jury might consider the evidence of bank deposits they must first find beyond a reasonable doubt

that Moore was a co-conspirator. (*Schultz* v. *State*, 133 Wis. 215; *People* v. *Monnais*, 17 Abb. Pr. 345, 349; 2 Wharton Crim. Ev. [10th ed.] § 698, p. 1432; *Commonwealth* v. *Brown*, 14 Gray, 419, 432; *United States* v. *McKee*, 3 Dill. 546, 550; Fed. Cas. No. 15,685; *Miller* v. *Dayton*, 57 Iowa, 423, 429, and *State* v. *Roberts*, 201 Mo. 702, 727, 728; 100 S. W. 484.) (See *People* v. *Becker*, 215 N. Y. 126, 149.) The defendants had a right to an impartial trial upon legal evidence, and this court cannot disregard the admission of inadmissible evidence unless such admission could by no possibility influence the jury. (*People* v. *Altman*, 147 N. Y. 473.) It cannot be said that the evidence of Moore's bank account did not influence the jury, and the failure of the trial court properly to instruct the jury in reference thereto was error. For these reasons I agree with the conclusion reached by Mr. Justice KAPPER.

I think there was another error by which defendant Connolly's rights may have been prejudiced. The defendant Connolly called character witnesses, among whom were Justice Humphrey, Father Meehan and Doctor McGill. The learned Deputy Attorney-General who prosecuted the indictment, after telling the jury that he had heard the law in respect to the weight to be accorded character evidence many thousands of times, said in his summation: " But. if Judge Humphrey, Father Meehan, Dr. McGill, that school principal and that life insurance agent, if they were jurors, if they took oath as jurors and heard all the evidence that you have heard in three weeks, every single one of those men would vote for the conviction of Connolly, and I will stake my professional reputation on it." Upon objection being raised to this statement of the Deputy Attorney-General, the learned trial court said: " I do not think there is any impropriety in the suggestion."

It has been frequently stated that evidence of good character is a matter of substance, not of form, in criminal cases, and must be considered by the jury as bearing upon the issue of guilt even when the evidence against the defendant may be very convincing. (*People* v. *Colantone*, 243 N. Y. 134, 136.) Our late associate, Mr. Justice JAYCOX, in *People* v. *De Martine* (205 App. Div. 80, 84), said: " The proper attitude of the court would have been to instruct the jury that the opinion of the assistant district attorney as to the guilt of the defendant should be disregarded and that, if in the course of his summing up he had asserted his personal opinion, it was the duty of the jury to disregard that opinion entirely, and that it was highly improper for the assistant district attorney to make any statement to the jury in relation thereto." The jury may have considered that these remarks of the prosecutor, and their judicial

approval by the learned trial court, destroyed the value of defendants' proof of good character.

The error in reference to the admission of evidence of Moore's bank account, together with the remarks of the Deputy Attorney-General, which I cannot say were not prejudicial, may have influenced the jury, and I, therefore, dissent and vote for reversal of the judgment of conviction.

KAPPER, J. (dissenting). The prosecution contend that the testimony of Moore's bank account was admissible " as part of the proof that Moore was, in fact, a *member* of the conspiracy," and that " Moore's bank deposits were admissible as some evidence, along with all the other evidence in the case, including Moore's recommendations, that *Phillips had bribed Moore* as an act in furtherance of the common conspiracy between Phillips, Connolly and Seely." The evidence must, therefore, be deemed to have been offered and received as being competent evidence tending to prove Connolly and Seely guilty as charged. The record is concededly silent as to the *source* of this bank account. If the evidence was competent, I am unable to discern why like testimony could not be offered against numerous other public officers who had a duty in connection with the approval of contracts for sewer work and the payment of the cost thereof. Such approval of, or participation in furthering the contracts, susceptible in itself of the inference of an innocent act, is sought to be fortified as a corrupt act by testimony of a bank account of one of the so-called co-conspirators, not on trial, where there is no proof from which it could be found, apart from speculation, that the money was corruptly acquired. No legal question can arise that one not named in an indictment may be proved to be a co-conspirator. Does this proof of " sudden enrichment " have, in the circumstances, the probative force claimed for it? Evidence of so-called " sudden enrichment " has never been admitted, as I understand it, except as a " circumstance of suspicion " *always subject to explanation*. As was said in *Martin* v. *State* (104 Ala. 71, 77): " The fact is open to explanation, and all unfavorable inferences arising from it may be removed by tracing the change to any source consistent with the hypothesis of innocence." Or, as declared in *Boston & Worcester R. R. Corp.* v. *Dana* (1 Gray, 83, 103), such evidence " unexplained " has a tendency to implicate. In *Williams* v. *United States* (168 U. S. 382) it was pointed out that there was nothing requiring the defendant " to *explain* how he acquired the moneys," notwithstanding which " the jury were in effect told," as the court say, " that the failure of the accused to explain how he came by those sums, aggregating nearly five thousand dollars, was a circumstance tending to show

that if he had given that explanation it would have operated to his prejudice in meeting the particular charges." Indeed, the learned Attorney-General points out as a basic reason why proof of defendant Connolly's financial transactions had such a probative force as gave rise to an unfavorable inference against him, that *when he was a witness in his own behalf* he failed " to *explain* " his financial transactions and the source of such moneys. In fact, no authority is referred to that accords to such proof any greater force than that it is a circumstance open to explanation.

No proof was adduced to show that the sums to Moore's credit in the bank were derived from any fraud practiced upon the city. That such was the fact was purely an inference predicated upon the magnitude of the deposits as contrasted with his proved earning capacity. This inference or presumption, even as against Moore, was rebuttable, as are all inferences and presumptions. The deposits may have represented legitimate business transactions; they may have represented an inheritance, a legacy or a gift *inter vivos*, or they may have been derived from some fraud practiced upon the city or some one else. Even if the evidence were admissible against Moore, the inference to be drawn therefrom is based upon the uncertain premise of an undisclosed source.

Moore, Connolly and Seely were claimed to be joint conspirators, and any act of Moore in furtherance of the conspiracy would be admissible against the other two. But no such *act* was proven by the bank account. The moneys found on deposit to Moore's credit were not proven to have been derived from a fraud practiced upon the city in furtherance of the conspiracy, for these moneys may have sprung from an honest source. At the most they gave rise to an inference; they did not prove an *act*. In the law of conspiracy there is no rule that a rebuttable inference of the guilt of one conspirator, predicated solely upon conduct or circumstances concerning him alone, give rise to a similar inference of guilt against another alleged conspirator. The act of one is the act of all, but an inference against one is not an inference against all. The possession and deposit of these moneys by Moore may have created a permissible inference against him, but not against Connolly and Seely, who are not connected with their origin, who did not possess them and who did not deposit them. To base an inference upon an inference and a conclusion upon a conclusion violates a fundamental rule of evidence applicable alike to all branches of the law. Neither an inference of law nor of fact may be based upon another inference, which in turn is predicated upon uncertain premises. An inference based upon the unexplained source of bank deposits, even if admissible against Moore, the depositor, cannot give rise

to an inference against Connolly and Seely. In *Lamb* v. *Union R. Co.* (195 N. Y. 260, 266) it was said: "It is a well-settled rule of law that you cannot base inference upon inference. (*O'Gara* v. *Eisenlohr*, 38 N. Y. 296; *Ruppert* v. *Brooklyn H. R. R. Co.*, 154 N. Y. 90.) Every inference must stand upon some clear, direct evidence, and not upon some other inference or presumption."

Moore was not on trial and was not called upon to defend himself. Certainly the defendants on trial were not called upon to explain Moore's bank account, admitted, according to the prosecution, as evidence that Phillips had bribed Moore. If the inference of guilt was permissible against Moore, it was solely because of the magnitude of his bank deposits, a circumstance which concerned him alone. Under all settled principles such an inference against Moore would not support a further inference against Connolly and Seely, who were strangers to the circumstance which supported the inference against Moore. The evidence seems to me to have been inadmissible for any purpose against the defendants on trial. It permitted the jury to speculate as to Moore's guilt and to base their speculation upon a circumstance capable of an innocent explanation, and then to speculate further and conclude that because Moore was probably guilty, Connolly and Seely also were probably guilty. It permitted a subsequent inference to be based upon a prior inference, which itself was predicated upon an uncertain premise. On this trial it could not have been judicially determined as against Moore that these moneys were derived from a fraud practiced upon the city and, therefore, that he had performed an act in furtherance of the conspiracy. This necessarily follows from the fact that Moore was not on trial. He did not have his day in court with an opportunity for explanation. The impossibility of a binding judicial finding of Moore's guilt of an act of fraud in this respect, based upon facts and circumstances creating a rebuttable inference against him, necessarily renders the same facts and circumstances inadmissible as against Connolly and Seely. As against Moore, who is not on trial, the presumption is that the moneys deposited by him were honestly acquired.

It is also urged that the proof went no further than to permit a consideration of its weight by the jury who could disregard it. Can we say they did? If they did not, then they found Phillips had bribed Moore. Was not this the sheerest speculation? The testimony thus discussed seems to me to have been incompetent and the error in its admission prejudicial requiring a new trial. "Error is substantial when we can say that it tended to influence the verdict." (*People* v. *Sobieskoda*, 235 N. Y. 411, 420.)

Judgment of conviction, and orders denying motions in arrest of judgment and to set aside verdict, affirmed.